PRIGG v. LANSBURGH.

EVIDENCE; FALSE ARREST AND IMPRISONMENT; CRIMINAL LAW;
ARREST; PRACTICE.

1. An entry in a police complaint book is not admissible in evidence
in an action for false arrest, to show who the complainant was,
in the absence of testimony showing that the entry was made
in the presence or with the knowledge of the defendant.

2. *Quære*, whether an officer or citizen has the power to make an ar-
rest, without warrant, for the offense of petty larceny or embez-
zlement.

3. Mere information to an officer by a citizen, tending to show that
an offense has been committed and that a person named may
be suspected, is not sufficient, of itself, to warrant the inference
that the informer or his agents participated in the alleged un-
lawful arrest and imprisonment of the accused by the officer.

4. When the undisputed evidence is so conclusive that the trial court
would be compelled to set aside a verdict returned in opposi-
tion to it, the court may direct a verdict.

No. 353.  Submitted November 21, 1894.  Decided December 4, 1894.

HEARING on appeal by the defendant from the judgment
on a verdict directed by the court in an action for false ar-
rest and imprisonment.  *Affirmed.*

The COURT in its opinion stated the case as follows :

This action was begun by the appellant, William Prigg,
as plaintiff, against Lansburgh & Bro., Abram Hart and one
Henry Raff, to recover damages for false arrest and impris-
onment.  Lansburgh & Bro. were retail merchants in Wash-
ington, and carried on a large business, requiring a great
number of salesmen and clerks.  Abram Hart was their
bookkeeper, and Henry Raff was a detective officer in the
service of the District of Columbia..  Appellant was a sales-
man stationed on the third floor, and in the system pursued
was registered as No. 88.  Each salesman was provided

with a book with cheques or leaves, to be torn off in pairs or duplicates, which were also numbered consecutively. When a sale was made the salesman was required to enter the same upon the duplicate cheques, with the aid of carbon, one of which had its heading printed in black and the other in red. The black and red cheques were both placed in the mechanical carrier, with the money, and sent to the cashier, where they were taken out, compared and stamped. The black cheque was retained by the cashier, and, later, handed to the auditor; the red one was returned to the salesman, who then gave it, with the article sold, to the wrapper, who in turn handed it to the auditor. Thus the auditor was enabled to keep account of the cashier by comparing the duplicate cheques. It was observed that occasionally a black cheque was missing; that is to say, none was handed in by the cashier to correspond with certain red cheques delivered to the auditor. Suspicion was directed to appellant, as these missing duplicates were of red ones in his number. An arrangement was made to watch him. The floor walker was directed to give a signal to Hart when appellant was engaged in making a sale, and Hart dropped the word "*watch*" to the cashier, whose assistants, save one, were not in the secret. In the afternoon of November 2, 1891, the word was given to the cashier, who, with an assistant, carefully watched the carrier. No cheques came from appellant. Soon after a red cheque was handed to the wrapper by appellant, showing the sale of a cloak for $4. This cheque was stamped in proper manner and bore the number 2. Hart carried the red cheque to appellant, and asked if he remembered the sale, to which he replied, "I do." Hart then said: "Where is the other one? What did you do with that?" Appellant said he had sent it to the cashier's desk. Upon Hart's saying it had not been received, appellant said: "Well, what have I got to do with that? I sent it down." Appellant was requested to produce his book, and the first cheque number therein was 19. The cashier then said: "Mr. Prigg, how do you account for

this $4 cheque being No. 2, while the next cheque in your book is No. 19?" He replied: "Why, I don't know; it looks right bad." Appellant testified to his arrest as follows: "At the time of the arrest I was called down stairs by Mr. Gans, who was manager for Lansburgh & Bro. Mr. Raff was there, and he said to me that it had been reported there was some money missing and asked me to make an explanation. I said I had no explanation to make; that I had a receipt from the cashier. I was asked to go with the officer." . . . He was taken to the Police Headquarters and searched; "was kept there a half or three-quarters of an hour, when I was taken to the sixth precinct station on New Jersey avenue and put in a cell. A charge of larceny was entered on the blotter, and I was kept there until the next morning, when I was carried to the Police Court and gave bond for my appearance to answer the charge of larceny. Afterwards the charge against me was changed to embezzlement of $27, and I was required to give bail on that charge, and had a hearing before Judge Miller which lasted two days; Judge Miller discharged me." He further said: "While I was at Police Headquarters Mr. Hart came there and questioned me. He said he supposed there was a clique of us there; that Mr. Lansburgh did not wish to prosecute the case, and if witness would make a confession against the gang the matter would be allowed to drop. He did not say what would be done if I did not confess." The appellant also said that he sent to the cashier's office the black cheque with the red one, and a $5 bill handed him by the purchaser of the article sold, and received back the red cheque and $1 in change which he gave to the customer.

There was some other evidence tending to show that money shown on red cheques of appellant's number (88), for which no corresponding black cheques could be found, amounted to about $28.35, from October 23 to November 2.

The only testimony offered was on behalf of the appellant, who introduced, after testifying himself, certain employees

of the house, including the general manager, Gans, the cashier, and the "floorwalker" of his floor. He also called the chief of police, who said that "Henry Raff was one of the official detectives under witness; that during all of 1891 said Raff was on the regular detective force stationed at Police Headquarters, and in sound mental condition at that time; that, as a rule, a detective receives no instructions, but when sent to investigate a case acts upon his own discretion." Raff subsequently became insane, and was in an asylum at the time of the trial, and on that account plaintiff dismissed him from the case.

The witnesses connected with the house gave evidence tending to show that the arrest was made by Raff on his own responsibility. Neither of the Lansburgh Brothers was present during any of the proceedings in the store, and no orders were given by them so far as the testimony shows. Appellant was sent for to come to the office of the general manager, who is not a party to the case. There occurred the interview, which he related, between himself and Raff, and from thence he was taken by Raff to the police headquarters.

Gans, the general manager, was called by plaintiff, and in his direct examination stated positively that "the arrest was made without the knowledge of our firm." He also exonerated Hart from any connection with the arrest. The only evidence of any direct knowledge of the affair brought home to either of the Lansburghs was in the following statement of a witness for plaintiff, Mrs. Center, who said: "I am acquainted with the Lansburgh Bros., and on or about —— date, I called in the store, and meeting James Lansburgh inquired, 'What have you been doing with Mr. Prigg?' He answered, at first: 'We have not been doing anything with him.' I said: 'Yes, you have; you have had him arrested and charged with larceny.' He then said: 'The less you say about that matter the better. Our detectives have been watching him, and we were determined to break up the matter that was going wrong in our store.'"

Another attempt was made to connect the Lansburghs with the arrest by an offer in evidence of the entry in the record book of the detective office in the Police Department, which showed a charge entered against appellant of "petit larceny," and under the same, "Lansburgh & Bro. and A. Hart, complainants." This the court excluded in so far as the entry of the complainants was concerned.

In the above statement of the facts we omitted to mention that, in order to account for the cashier's office stamp upon the red cheque, it was shown in the cross-examination of the cashier, that the stamp was left on the desk in his quarters, and could have been taken and used with ease, as the store was opened and the employees admitted frequently before he came.

Upon motion made at the close of plaintiff's evidence, the court instructed the jury to return a verdict for the defendants, and from the judgment thereon the plaintiff has appealed.

*Messrs. Cook & Sutherland* for the appellant :

1. It can neither be doubted or disputed that records kept by public officers, required by law to do so, are evidence against all parties of the facts stated in such records. *Garvey* v. *Wayson,* 42 Md. 178 ; Starkie, Pt. 2, Sec. 40 ; *People* v. *Dennison,* 17 Wend. 312 ; *Gurney* v. *Howe,* 9 Gray, 404.

The court had no power to exclude any part of such a record. Regularly proven, it could not be rejected. Nor had the court any power or authority to consider the wisdom or propriety of the act of Congress. It is a fundamental rule of statutory construction that Congress in enacting a law knows what it intends to enact, the purpose and scope of the act, its consequences, etc., and when it says that complaints are to be so made it must be assumed that it had before it just such complaints, among others, as is found in this record.

Besides, this record was clearly admissible for the purpose

of proving, or tending to prove ratification of the act of the employees of the Lansburgh establishment in causing or aiding the arrest of the appellant, even if such act on the part of the employees had been *ultra vires*. The third section of the act referred to makes the record prescribed to be kept by the detective department notice to all persons of the entries thereon, by requiring the books mentioned, in which the records are, to be kept open to public inspection.

2. An instruction to the jury to return a verdict for the defendants is in the nature of a demurrer to the evidence, and is to be tested by the same rules of law as a demurrer, and, being such, it necessarily admits every conclusion which a jury might draw from the evidence adduced. The evidence, apart from the police records, as to the arrest of the appellant, the place where the arrest was made, the manner in which it was made, the parties who participated in it immediately before and after, the declarations of two of the defendants, all required to be submitted to the jury. These were facts which either did or did not tend to connect the defendants with the arrest, and whether they did or not was a question solely for the jury.

*Mr. A. S. Worthington* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The first question to be considered is whether the court erred in excluding so much of the record entry in the complaint book at Police Headquarters as showed that the appellees were entered as complainants therein. The statute provides that these books shall be kept, and that therein " shall be entered every complaint preferred upon personal knowledge of the circumstances thereof, with the name and residence of the complainant." R. S. D. C., Sec. 386. The entry as to the charge of petty larceny is stated in the history of the case given above, and need not be repeated. In connection therewith another entry was offered, under date of November 7, 1891, as follows:

" Embezzlement—Money. Raff.—Lansburgh & Bro., 420 to 426 7th St., N. W., reports that Wm. Prigg did embezzle from said firm at different days from Oct. 23d to Nov. 2nd, 1891, $27.13."

This was followed by another entry or memorandum showing that Raff arrested Prigg on a charge of petty larceny which was "*nol. prossed*," and embezzlement substituted. The officer who produced the book was examined by plaintiff, and testified that he made the entry of the charges; that Raff brought in the prisoner and dictated the entries; that witness had no personal knowledge, and all the entries were based upon statements made by Raff to him at the time. The statute does not, in express terms, authorize the admission of the record as proof of the facts contained in it; but it must be conceded that public records do not always require this special authorization, where relevant. *Evanston* v. *Gunn*, 99 U. S. 660, 666 ; 1 Gr. Ev., Sec. 483.

As the record amounts to a mere memorandum, often made upon hearsay, as this one was, it may well be doubted if it is admissible at all under the rule laid down in the authorities above cited, save as an admission of the person or authority by whom it is actually made. But we need not determine this ; for, granting its admissibility and its effect to make a *prima facie* case even, its effect is clearly destroyed as to those whose names are entered thereon in their absence, whenever or however that fact may be made to appear. Where the entry of the name of a complainant or private prosecutor is made in this book upon the statement of a third person, when he is not present and is not shown to have confirmed or ratified it, it is no more admissible against him than other hearsay evidence would ordinarily be. Had the record been offered and admitted even as *prima facie* evidence, the court must necessarily have instructed the jury to disregard it, in so far as it concerned the defendants then before the court, upon its

being made to appear that the entry had been made upon the report of a third person, in their absence.

It appears from the bill of exceptions that the proof referred to above, showing the circumstances under which the entry was made, was offered before the record and as introductory thereof. As it showed the absence of the defendants, and no offer was made to connect them with it in any other way, the court did not err in excluding the recitals referring to them.

2. A point has been made in this case by the appellant, and supported with an argument displaying much learning and research, respecting the power of an officer or a private person to make an arrest, without warrant, for the offenses of petit larceny and embezzlement. The contention is that neither offense is a felony at common law, nor has been made one by any law in force in the District of Columbia.

The officer who made the arrest is no longer in the case, and under the view that we have taken of the facts presented on the record with regard to the other defendants, the decision of this question is not necessary. We may add, too, that the same question is under consideration in another case, in which Mr. Justice Morris is disqualified to sit because formerly of counsel therein, and for this reason, as the point does not necessarily arise, we have not considered it.

3. The court did not err in directing the return of a verdict for the defendants upon the evidence submitted by the plaintiff. This evidence is stated with sufficient fullness in the preliminary statement and need not be repeated. Without intending to intimate an opinion as regards the guilt or innocence of the appellant of the offense charged against him, or to decide that there was probable cause for his prosecution, we hold that there is not sufficient evidence in the record to warrant a finding that the appellees actually arrested the appellant or commanded or requested the officer, Raff, to do it. It is true that the facts were reported to Police Headquarters, and Raff came to investigate them.

He heard the statements, examined the accused and made the arrest. There is no evidence to show that he did so at the request or under the persuasion of appellees, or any one of them, and the reasonable inference from all the evidence is that he made the arrest in the exercise of the discretion conferred upon him, according to the evidence of the chief of police.

Mere information to the officers of the law by a citizen, tending to show that an offense has been committed and that some person named may be suspected of its commision, is not sufficient, of itself, to warrant the inference that the informer or his agents participated in the unlawful arrest and imprisonment of the accused by the officer.

The circumstances under which a court is justified in directing a verdict are well settled. " When the undisputed evidence is so conclusive that the court would be compelled to set aside a verdict returned in opposition to it, it may withdraw the case from the consideration of the jury and direct a verdict." *Elliott* v. *Chicago, etc., Rwy. Co.,* 150 U. S. 245, 247 ; *Howes* v. *Dist. of Columbia,* 2 App. D. C. 188.

There being no error in the proceedings below, *the judgment must be affirmed, with costs to the appellees; and it is so ordered.*