# LEVY v. VAUGHAN.*

PHYSICIANS AND SURGEONS; MALPRACTICE; EVIDENCE; BURDEN OF PROOF; DEATH CERTIFICATE; HYPOTHETICAL QUESTIONS; CUSTOM AND USAGE; DEATH; NEGLIGENCE; PROXIMATE CAUSE; TRIAL; DIRECTED VERDICT.

1. A surgeon is bound to exercise such skill and care as are usually exercised by surgeons in good standing. (Citing *Sweeney* v. *Erving*, 35 App. D. C. 57, 43 L.R.A. (N.S.) 734.)

2. The plaintiff in an action against a surgeon for malpractice alleged to have resulted in death must prove that the death was caused by the defendant's failure to exercise due care. (Citing *Ibid.*)

3. A death certificate made by the coroner, who signed as attending physician, upon a blank required by the health department to be filled out and certified by the attending physician where an inquest is unnecessary, apparently for the mere purpose of giving statistical information, is not admissible in evidence to show the cause of death, in an action against a surgeon for malpractice, where the coroner was not in attendance upon the patient, and did not perform the autopsy, and his information regarding the cause of death was derived from others, and where he was available as a witness. (Citing *National Union* v. *Thomas*, 10 App. D. C. 277; *Prigg* v. *Lansburgh*, 5 App. D. C. 30; and *Snell* v. *United States*, 16 App. D. C. 501.)

4. A hypothetical question in an action against a surgeon for malpractice alleged to have resulted in death, propounded to surgeons testifying for the defendant, and involving the sufficiency of the defendant's preliminary examination to determine whether the patient could be safely anesthetized, is not objectionable upon the ground that it does not refer to choking sensations from which the patient at times previously suffered while sleeping, and of which the defendant was seasonably informed, where such sensations were included in the cross-examination of at least two of the experts, and the uncontra-

---

*Physicians and surgeons—malpractice.*—For authorities upon the question of the degree of care and skill which a physician and surgeon must exercise, and his liability for malpractice and negligence, see note in 37 L.R.A. 830.

As to the liability of physician or surgeon for acts of associate, see note in 42 L.R.A. (N.S.) 785.

dicted evidence shows that a careful preliminary examination was made by the defendant.

5. A hypothetical question relating to the presence of physicians during the administration of ether by a medical student, propounded to surgeons testifying as experts for a surgeon in an action against him for malpractice, *held* sufficiently to embody the evidence.

6. Reference to the condition of the valves of the heart need not be made in a hypothetical question in an action against a surgeon for malpractice, propounded to surgeons testifying for the defendant as experts, and involving the question whether a careful examination of the patient before anesthetization would have disclosed the heart weakness which an autopsy revealed, where the operating surgeon testified that the valves were not affected, and the plaintiff's witnesses, although testifying that the valves were affected, did not describe the nature of the affection, and where the evidence showed that there were several ways in which they might have been affected, but that, to be discoverable by outward examination, the affection must be of a nature indicated by murmuring sounds, from which the patient's heart was free.

7. Whether evidence that it is the custom in a clinic in a distant state, to intrust to an advanced medical student of experience the administration of ether to a surgical patient, is admissible in an action for malpractice in pursuing the same course in the District of Columbia, where it is not shown that the same custom exists in the District,— *quære*.

8. Evidence that it is the custom in a clinic in a distant state, to intrust to an advanced medical student of experience the administration of ether to a surgical patient, is admissible in an action for malpractice in pursuing such a course in the District of Columbia, where there is evidence that the same custom prevails in the District.

9. The refusal of a trial court to permit an expert witness in an action against a surgeon for malpractice, to answer the question whether a surgeon would be in the exercise of due care if he intrusted to an advanced medical student of experience the administration of ether to a surgical patient, without making some provision for the presence of an experienced physician, is not error where the evidence in appellant's behalf shows that at least two experienced hospital physicians were present generally during the administration; and it is immaterial whether they were provided by the defendant or not.

10. The refusal of the trial court to permit an expert witness in an action against a surgeon for malpractice in the District of Columbia, to answer the question whether an advanced medical student of experience, if intrusted with the administration of ether in the absence

of a duly licensed physician of the District, would be as likely to obtain successful results as a trained anesthetist, is not error where two competent hospital physicians, licensees of another state, saw the patient during the administration, and there is nothing to show that a District license would have added to their competency, and where another expert testified that the student would be competent if a graduated physician were in the room, and especially where the expert to whom the question was propounded had already given testimony which substantially answered the question.

11. Testimony of an expert witness in the trial of an action against a surgeon for malpractice, that the administration of an anesthetic is not technically difficult, and that students are permitted to do it, and that it is only necessary to see that the student has witnessed a certain amount of anesthetic administered, and has obtained a technical training, and that, if he has also given an anesthetic, it is not necessary that the surgeon or a graduate physician stand by and watch over the patient, especially if the surgeon or a physician is in the room and able to give any assistance required,—is a substantial answer to the question subsequently propounded to him, whether an advanced medical student of experience, if intrusted with the administration of ether, would be as likely to obtain successful results as a trained anesthetist, and justifies the trial court in refusing to permit the witness to answer the same when propounded.

12. The exclusion by the trial court in an action against a surgeon for malpractice, of the hypothetical question whether it would be reasonable care to permit a medical student to administer an anesthetic without the presence of a physician during the excitement period, is proper where the evidence shows that the house physician was present during most of the excitement period, and he has testified to examining the patient and finding nothing unusual, and the patient passed the excitement period safely, the administration continuing thereafter for about twenty-five minutes.

13. An action for death alleged to have been caused by negligence in the administration of an anesthetic may be maintained against a surgeon only where an action could have been maintained for negligent administration if death had not ensued.

14. Apart from the doctrine of *res ipsa loquitur*, negligence can be imputed to no one from the mere happening of an accident.

15. Negligence cannot be imputed to a surgeon with reference to the administration of an anesthetic to a patient who died under its influence, unless it is established that the death was caused by the anesthetic.

16. A verdict is properly directed for the defendant in an action against

him for death alleged to have resulted from negligence in the administration of ether to a patient having a weak heart, where the testimony of all the expert witnesses does not indicate certainly that the death did result from ether, though many,—defendant among them, —testify that the ether may or may not have been the cause, and that they would not have administered ether to a patient if they knew that his heart was in the condition of the deceased's, as disclosed by an autopsy.

17. There is no evidence of negligence relative to the examination of a patient to determine whether anesthetization would be safe, which will preclude the direction of a verdict for the defendant in an action against him for death alleged to have been caused by the negligent administration of ether to a patient whose heart an autopsy showed to be affected with fatty degeneration and impaired valves, where the surgeon testifies that he twice examined the patient for the purpose, stating that he used all the means employed in such examinations, and mentioning some of them, and the anesthetist testifies that he too made an examination, and their testimony is not contradicted, and none of the experts testify that the examinations were lacking in any particular, and practically all of them agree that fatty degeneration cannot be detected in advance of an autopsy, and the single witness who testified that the valves were affected did not state the extent of the affection, or declare whether it was sufficient to be discoverable by an outward examination, and the experts on both sides testify that there are valvular affections which cannot be detected by such an examination.

18. Directing an advanced medical student of experience to administer the ether will not be regarded as negligence which will disentitle a surgeon as defendant to a directed verdict in an action for death alleged to have been caused by negligence relative to the administration of ether to a patient having an impaired heart, where there is no evidence tending to show that the same was negligence.

19. Legal responsibility of one person to another cannot be predicated upon evidence from which the jury can draw an inference only by speculation, it being necessary that the evidence be positive to such a degree that the inference naturally arises.

20. There is no evidence of want of the ordinary care required of an anesthetist, which will preclude the direction of a verdict for the defendant in an action against a surgeon for death alleged to have been caused by negligence in the administration of ether by the defendant's agent, where the evidence introduced to show negligence is merely speculative, and especially where the experts testify that the amount of ether administered was very small, considering that

the administration lasted twenty-five or thirty minutes, and the person who administered it, having been called as a witness by the plaintiff, testifies as to pulse tests and other observations taken by him, and states that the patient took the ether normally and comfortably, and all of the experts testify that the course adopted in administering the ether was an exercise of due care, and the defendant testifies that when he first saw the anesthetized patient he looked like any other patient under an anesthetic, until he was placed upon the operating table, when he began to show a cyanotic condition.

No. 2619.   March 4, 1914.   Decided April 6, 1914.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia upon a verdict directed by the court in defendant's favor in an action to recover damages for malpractice alleged to have resulted in the death of the plaintiff's intestate.            *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a judgment in an action for damages, entered for the defendant on a directed verdict.

The plaintiff, Michael A. Levy, as administrator of the estate of Charles R. Beckett, deceased, charged that defendant, George Tully Vaughan, had been engaged to perform an operation on said Beckett for hernia.   That it was his duty as a surgeon to make a careful examination of the heart and lungs of the patient in order to ascertain whether he was in a physical condition to admit of the administration of an anesthetic, as well as to engage a competent and careful anesthetist, and to supervise, or cause to be supervised by a competent person, the administration of the anesthetic.   That defendant negligently failed to examine the physical condition of the patient, and to engage a competent anesthetist, or to supervise the administration.   That defendant's agent administered the anesthetic in an excessive amount, and in a careless manner, by reason whereof said Beckett died.   Preliminary facts necessary to the understanding of the cause of action, and which are substantially conceded, are that Beckett was a man about 6 feet, 1 inch, in

height, weighed 275 pounds, and was suffering from hernia that required surgical treatment. Dr. Vaughan undertook to perform the operation at Georgetown University Hospital, and the patient arranged with the hospital authorities and was received as a free patient on January 20, 1911, and assigned to a bed in a ward. On the 23d ether was administered in the room provided therefor by what is called the "open method," with the "Esmark inhaler."

The administrator of the ether was a medical student in his last year of a four-years course, graduating in the following June. He had carefully studied the subject of administering ether, and had observed its administration in at least a thousand cases in a number of hospitals in the city, including Providence, the Children's, and Georgetown University Hospital. He had actually administered ether, before, in eight or ten cases. Two medical internes, graduated surgeons and physicians, were in and out of the room during the administration. Not more than 3 ounces of ether (a moderate amount) were administered during the twenty-five or thirty minutes required to get the patient completely under its influence. No unusual condition was noticed until after the patient had been wheeled into the operating room and lifted to the operating table. He was then observed to be blue in the face,—a cyanotic condition. Dr. Vaughan, who was waiting in the operating room, noticed the condition immediately, felt the patient's pulse, and started artificial respiration. He seemed better, but was taken back to the ward, and respiration got bad again. Remedies were used and Dr. Vaughan was sent for and again performed artificial respiration; but the patient's respiration ceased and he died. An autopsy was performed and the patient's heart was found to be in a state of fatty degeneration.

*Mr. Alvin L. Newmyer* and *Mr. Milton Strasburger,* for the appellant:

1. The question as to whether Mr. Beckett lost his life in consequence of the administration of ether should have been

submitted to the jury. The evidence for plaintiff was sufficient to warrant the inference that he died as the result of the administration of ether.

Proximate cause is ordinarily a question for the jury. *Providence & S. S. S. Co.* v. *Clare,* 127 U. S. 45, 32 L. ed. 199; *Guenther* v. *Met. R. R. Co.* 23 App. D. C. 493, 503, 510; *Wash., A. & Mt. V. R. Co.* v. *Lukens,* 32 App. D. C. 442; *Texas & P. R. Co.* v. *Howell,* 224 U. S. 577.

2. To say that the valvular defect was not discovered on preliminary examination, when it should have been, raises a natural inference of some negligence in the preliminary examination.

Negligence, like any other fact, may be proved by circumstantial evidence. *Texas & P. R. Co.* v. *Carlin,* 189 U. S. 354; *Maraude* v. *Texas & P. R. Co.* 184 U. S. 173, 183.

3. Where reasonable men may differ, then the question is for the jury to determine. *Texas & P. R. Co.* v. *Gentry,* 163 U. S. 353; *R. R. Co.* v. *Ives,* 144 U. S. 408.

4. The certificate showing that Charles R. Beckett died on January 23d, 1911, was admissible in evidence to prove facts set forth therein, because the same was an official certificate of a public officer, made in pursuance of law. *Evanston* v. *Gunn,* 99 U. S. 660, 25 L. ed. 306.

*Mr. Walter C. Clephane* and *Mr. Alan O. Clephane* for the appellee:

1. The mere fact of death under the influence of an anesthetic will not alone support a recovery for malpractice. *Spain* v. *Burch* (Mo.) 154 S. W. 172.

2. A physician or surgeon is required only to possess and exercise that degree of skill and learning ordinarily possessed and exercised by members of his profession in good standing practising in similar localities, and it is his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning, and to act according to his best judgment.

30 Cyc. 1570; *Sweeney* v. *Erving,* 35 App. D. C. 57, 228 U. S. 233; *Whitesell* v. *Hill,* 37 L.R.A. 830.

3. The mere fact that writers on the treatment of a certain ailment, or practising surgeons, prescribe a certain mode of treatment, does not make it incumbent on a surgeon called to treat the ailment, to conform to such system. 30 Cyc. 1571; *Burnham* v. *Jackson,* 1 Colo. App. 237.

4. If the treatment is in accordance with a recognized system of surgery, it is not for the court or jury to undertake to determine whether that system is the best, nor to decide questions of surgical science on which surgeons differ among themselves. 30 Cyc. 1588; *Williams* v. *Poppleton,* 3 Or. 139.

5. A physician is not liable for an honest mistake or error of judgment, where there is a reasonable doubt as to the nature of the physical conditions involved. 30 Cyc. 1578; *Leighton* v. *Sargent,* 27 N. H. 460, 59 Am. Dec. 388 and note; *Tafft* v. *Wilcox,* 6 Kan. 46; *Branner* v. *Stormont,* 9 Kan. 51; *Patten* v. *Wiggin,* 51 Me. 594, 81 Am. Dec. 593; *Cayford* v. *Wilbur,* 86 Me. 414, 29 Atl. 1117; *Carpenter* v. *Blake,* 10 Hun, 358; *Wells* v. *Medical Asso.* 9 N. Y. S. 452; *Heith* v. *Glisan,* 3 Or. 64.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. It was the duty of the defendant to use such reasonable care and skill as are usually given by surgeons in good standing, but it was incumbent upon the plaintiff to prove that the death was caused by the failure of the defendant to exercise such care. *Sweeney* v. *Erving,* 35 App. D. C. 57, 61, 43 L.R.A. (N.S.) 734, s. c. 228 U. S. 233, 57 L. ed. 815, 33 Sup. Ct. Rep. 416.

The learned trial justice was of the opinion that there was a complete failure of evidence on the part of the plaintiff to show negligence either in the preliminary examination of the deceased, or in the administration of the ether; but he withheld his judgment until the defendant had introduced his evidence,

and then directed the jury to return a verdict for the defendant. Before considering the error assigned on this action of the court, it is necessary to consider certain assignments of error founded on exceptions taken to the rejection and admission of evidence.

2. The first of these is on the refusal of the court to permit the plaintiff to read in evidence the death certificate made by the official coroner. The particular item of this was "cause of death," which was thus stated,—"ether narcosis." This certificate is an official blank of the health department containing certain questions, as date of death, name, sex, color, occupation, etc., as well as cause and place of death, which are required to be answered and certified to by the physician who attended the deceased professionally during his last illness. The coroner was not in attendance upon the patient. He did not make the autopsy, and his information regarding the cause of death was hearsay. We think there was no error in excluding the certificate. The case of *Evanston* v. *Gunn,* 99 U. S. 660, 666, 25 L. ed. 306, 307, is relied on by the appellant in support of his exception. As stated in *National Union* v. *Thomas,* 10 App. D. C. 277, 291: "In *Evanston* v. *Gunn,* it was held that the official record of the weather observer at Chicago was admissible in evidence to show the condition of the weather upon the day that plaintiff received the injury, which was the subject-matter of her suit. In considering the effect of that case, however, it must be observed that the fact proved was not the issue of the case, but a mere incident thereof, and was also one of a character like, for example, the market price of articles of commerce at a time in the past, which it has been held may be proved by the private entries of disinterested persons dealing therein at the time. *Cliquot's Champagne,* 3 Wall. 114, 141, 18 L. ed. 116, 120." See also *Prigg* v. *Lansburgh,* 5 App. D. C. 30, 36; *Snell* v. *United States,* 16 App. D. C. 501, 517. Whether the death was caused by the ether was one of the issues in the case which the jury was impaneled to determine. The coroner was an available witness and might have been called to testify to any actual conditions observed by him. As a matter of fact, he had

no direct knowledge of the facts, but certified upon information derived from others. Moreover, the certificate was not an official certificate as coroner, but a formal requirement of the health department, of attending physicians, where there has been no occasion for an inquest; and its apparent purpose is to furnish statistical information. It was signed formally by the coronor as attending physician.

3. The seventh assignment of error relates to the hypothetical questions addressed to several surgeons who testified for the defendant.

(1) The omission from the first of these were certain choking sensations of the deceased, which his wife had testified to as occurring at times when he was sleeping, and communicated by her to defendant. The record shows that these choking sensations were included in the cross-examination of at least two of the surgeon experts; they might have been included in that of the others also. These sensations were relied on as important in determining the care required in an examination of the patient before preparing to operate upon him; and the uncontradicted evidence shows that such careful preliminary examination had been made by the defendant.

(2) The second exception is not well founded. It relates to the presence of physicians during the administration of the ether, and embodies strictly the evidence relating thereto.

(3) The third question relating to the condition of the valves of the heart at the autopsy. The operating surgeon testified that the valves of the heart were not affected. Plaintiff's witness testified that the valves were affected, without describing the nature of the same. The evidence showed that there are several ways in which the valves of the heart may be affected, but that such affection, to be perceptible upon outward examination, must be of a nature indicated by murmuring sounds, which was not the case in this instance.

(4) In the course of the examination of Dr. Bovee, in response to questions concerning negligence in intrusting the administration of ether to an advanced medical student of experience, he said that it was the custom in the Mayo Clinic, in

Minnesota. The objection is that proof of custom is not admissible unless it be shown that the same custom exists in the District of Columbia. Assuming, without deciding, that the custom must be shown to exist also in the District, that objection is met by the evidence showing that it was customary in the District also.

(5) There was no error in refusing to permit the following question to be answered by Dr. Bovee: "In your opinion would a surgeon be in the exercise of due care if he intrusted the administration of ether to a student of the description given, without making some provision for the presence of an experienced physician?" The evidence on behalf of the plaintiff shows that at least two experienced hospital physicians were present generally during the administration. They were employed in the hospital, and that they may not have been provided by the defendant is wholly immaterial.

(6) There was no error in refusing to permit another medical witness to answer a question to the effect that if the administration of ether were intrusted to a student of medicine as described, in the absence of a duly licensed physician of the District, would the student be as likely to obtain successful results as a trained anesthetist?

The two physicians who saw the patient during the administration of the ether were graduate physicians and licensees of another State, and were not practising medicine in the District, but were engaged in the hospital and shown to be competent. There is nothing in the evidence to warrant an inference that the possession of a District license would have added to the competency of the physicians in attendance. That there could be no such inference is shown by the testimony of Dr. Bovee, who had answered affirmatively to the question if it would be safe to intrust the administration of ether to a student if a graduate physician was in the room. And he further stated that if such a physician were in the room, the student would be competent under the circumstances.

Again, Dr. Barton, to whom the foregoing question had been propounded, had already testified that the administration of an

anesthetic is not technically difficult, and students are permitted to do it. The only thing necessary is to see that the student had witnessed a certain amount of anesthesia performed, and had received technical training; and if he has given one, it is by no means necessary that the surgeon or a graduate physician should stand by and watch over the patient, especially if the surgeon or interne is present in the room and able to give whatever assistance may be required. This substantially answered the question and there was no occasion to call upon him to repeat it.

(7) The last hypothetical question propounded by the plaintiff and excluded was to the effect if it would be reasonable care to permit the student's administration without the presence of a physician during the excitement period,—the excitement period is the first stage of administration. The question was without foundation, as the evidence showed that the house physician was present during the most of the excitement period, and had testified to examining the patient and finding nothing unusual. Furthermore, the patient passed the excitement period safely and without sign of danger, and the administration lasted some twenty or twenty-five minutes longer.

4. The late Chief Justice Clabaugh, of the supreme court of the District, presided at the trial, and delivered an opinion, in granting the direction of the verdict, in which the legal questions are correctly stated, and the evidence fairly and fully analyzed. We are satisfied with the soundness of his reasoning, and were it not that this opinion is already long we would recite it here.*

---

*The COURT: Now, Gentlemen, suppose death had not resulted in this case and suit had been brought for the negligent administration of ether, without death. It seems to me that is the test in this case. Negligence can never be imputed to anybody because of the happening of an accident. Of course, I am not speaking now about *res ipsa loquitur.*

In the first place, as counsel very well says, before any negligence can be imputed to the defendant in this case, it must be established that the intestate died by reason of the effects of the ether. That is the first question, and without that the plaintiff has no standing at all in court, by the admission of counsel.

What does the evidence establish in this case? The evidence, at the

Contenting ourselves with a reference to it, we will merely add that there was no evidence whatever to justify submission

most, establishes that nobody is certain that the death did result by reason of the use of ether. That is established beyond the peradventure of a doubt. A great many of these witnesses, Dr. Vaughan among them, say that it may or it may not have; he cannot say; that this man's heart was in such a condition that he might have died at any moment of time without the administration of ether at all, and therefore they cannot tell; that whilst it may have been the ether, it may have been the condition irrespective of the ether.

There is no evidence in the case to show, and nobody says, that he died from the ether. There are a great many of the defendant's witnesses who say that if they had known the condition of this man's heart, they would not have administered the ether, but that does not mean that it therefore follows because they did administer the ether it was the cause of his death. No reputable physician would ever take the chance of administering ether where the effect might be death, without notifying the parties concerned.

Therefore, with the fact staring you in the face that nobody says to this jury that this intestate died from the effects of the ether, is it possible that the jury can say what the expert witnesses and all other witnesses in the case say that they cannot tell? Does the law mean that a jury can pass upon the cause of the death of a man, when those who ought to know cannot tell? The plaintiff's witnesses have said exactly the same thing that the witnesses for the defendant have said. Then, when all the witnesses concur in the statement that they cannot tell, on what theory of law can the court submit to a jury of twelve men unlearned in the sciences, the question of determining as to condition, when the experts themselves cannot tell?

It seems to me there is nothing else in this case. It is absolutely overwhelming, and, to my mind, it is absolutely conclusive of this question.

But if it were not,—who testifies in this case that Dr. Vaughan did not make a careful examination of this intestate? Of course, the only testimony in the case on that subject is his own. Nobody else could know unless they happened to be with him when he was making the examination. He tells you that he made a preliminary examination of the patient at his office, and told him it was only preliminary, and that he would make a further examination at the hospital. He goes on the stand and testifies that he did make that examination,—that he made it on Saturday; that he examined his heart, his lungs, and had a blood test made, and also had the urine examined. Does anybody say he did not? Is it not the line of conduct you would expect from a man

to the jury of the question of negligence, either in the preliminary examination of the patient, or in the administration of the

of Dr. Vaughan's reputation as it has been established in this case? If it were not done, it would be an act of gross negligence. It would be criminal negligence for any doctor ever to administer ether without advising himself in advance, by an examination, as to the condition of the patient.

This physician states that he made this examination on Saturday, that he examined his lungs as I have stated, and that he used all of the means of examination that are employed in examinations of this character, as has been shown in the evidence in this case. They did not ask him for the particulars of the examination, but he told you that he listened to his heart and to his lungs and had these other examinations made. Then he examined him a second time, out of abundant caution, and found the same results.

This young student likewise examined him on the very day of the administration of the ether. It is not an examination that can occupy very much time. I think he says he took fifteen minutes in making it. Dr. Vaughan, when asked, says he does not know how long he took, but a sufficient length of time to establish the fact in his own mind.

Does anybody say, in contradiction, that there was anything else he could do? Do they not all testify that the examination is made by listening to the heart, by examining the lungs, etc., as already testified to in this case? Does anybody say that Dr. Vaughan failed in these particulars? Does anybody say he did not do something that he ought to have done? If that is the fact, where is the evidence of negligence on his part, in making this examination?

In addition to that all the physicians testify that it is practically impossible for any physician to foretell fatty degeneration of the heart, in advance of an autopsy. Does anybody say that, by the exercise of reasonable skill and diligence, it might have been discovered? The plaintiff's witnesses and defendant's witnesses all agreed that it is impossible to foretell it. Dr. Brown testifies that, after the autopsy, he found not only this condition of fatty degeneration, but also that the valves of the heart were affected. All of the other witnesses who testify on the subject say there was no other affection of any kind so far as the heart was concerned, and that the man died of this fatty degeneration of the heart. So, then, the question arises, Were they unskilful in ascertaining that the valves of the heart were affected? There is no one who suggests how much the valves were affected, or whether they were in such a condition as to manifest any sign to the person examining the heart. We have testimony on both sides that there are valvular affections of the heart in which there is no murmur, and of which there is no

ether. The uncontradicted evidence shows conclusively that there was no lack of reasonable care by the defendant in making

sign which would indicate anything to the person listening. In this case we are not told how seriously they were affected, or whether they were affected seriously enough to discover a lesion by the murmur, if there was a lesion. The jury must grope in the dark as to how far these valves were affected, and as to whether they were so affected as to give out any sign to the examining physician. The jury are to guess, on the testimony of one witness that there was some affection of the valves, without saying how much, that, because the physician did not discover that affection, it is evidence of negligence. This would be building one inference on another, which cannot be done. So that there seems to be no evidence on that score.

Then we go a step further and we are told that the physician in charge was guilty of negligence in directing the student in question to administer the ether. Who says, in this case, that there was any negligence in that? Not a single individual. One or two say that they ought not to take a pulse less often than at five-minute intervals. Now we are asked to submit to the jury the question as to whether the agent whom Dr. Vaughan selected for the purpose of administering the ether was lacking in the ordinary care that would be required of a person who administered an anesthetic.

Can the court submit to the jury the question of whether he took the pulse only at intervals of ten minutes and therefore was guilty of negligence? That would be to permit the jury to guess or speculate. You cannot hold people responsible by evidence upon which the jury can draw an inference only by speculation. It must be proof that is positive to such a degree as that the inference naturally arises. In this case we have nothing but speculation on that subject.

But independent of all this, every physician says that the course this student pursued was a reasonably safe course, and that the manner of administering the ether was certainly the exercise of a reasonable degree of care, and one says of a high degree of care.

As to the quantity of the ether administered, some say it was an exceedingly small quantity, and that the fact that this intestate was under the influence by the administration of so small a quantity of ether was the best evidence to him of the exercise of the highest degree of care and ability in administering the ether.

Therefore, what evidence is there of lack of skill? The plaintiff's own witness has testified on that subject, and she cannot attack her own witness. There is nothing to show that he is a hostile witness, or that there is any animosity on his part. It is true that he is the man who administered the ether; but the plaintiff called him and is bound by the

his preliminary examination of the physical condition of the intestate, or in the administration of the ether.

The judgment is affirmed, with costs.                    *Affirmed.*

---

testimony of her own witness. He says that he noted the respiration and the pulse all the time. I think he used the words, "I noted the respiration and noted the pulse all the time."

How could he do this? It is the simplest thing in the world, according to the statement of this witness. While he was holding the mask he could have his finger on one of the pulses that is, perhaps, plainer than the pulse at the wrist. So that, at all times, he would know the condition of this man's respiration and pulse. Here you have an intelligent man testifying that he noted the pulse and respiration all the time and then took the pulse every five or ten minutes.

Now, what does that mean? It can mean but one thing, that he differentiates between noting and taking the pulse. The witness has explained that he was at all times observing the man's respiration and at all times noting his pulse, and that notation would develop whether there was any decided slowness or weakness of the pulse. You do not have to count to develop those things. You can tell it by the very feel of the pulse itself. You can do it yourself, if you have ever tried it. Here was a man who had been three years and a half at the school, who is plaintiff's own witness, and who testified that he noted the pulse all the time and took the pulse every five or ten minutes.

I think it is worth while to consider what evidence there is in the case of what occurred during the administration of the ether. Plaintiff's own witness testifies that he took it comfortably, and that during the entire period of the use of this anesthetic everything was normal. There was no indication that anything was wrong. There was nothing to indicate to his mind that this man was not taking the anesthetic normally and pleasantly, if you can use such a word,—in other words, that there was anything out of the normal; the evidence shows that he took twenty-five or thirty minutes, and that it was, as the other doctors stated, a very small amount of ether to have used in order to have gotten him into that condition. Plaintiff's own witness testifies that everything was normal and there was not a thing out of the way.

The defendant comes on the stand and says that when he came in and saw him he looked as any other patient would have looked who was under the influence of an anesthetic, until he was being lifted from the table, when this condition occurred.

With this statement of the case, what is there for the jury to pass upon? I have adopted everything plaintiff's counsel suggested to the court in argument. I always appreciate the method in which plaintiff's counsel try a case and I have listened intently to all the points. I felt

that I ought to have taken this case away from the jury at the very start, but I thought for the benefit of everybody, for the widow as well as for the defendant, that everything should be presented to show that no mistake had been made in this case, so that she could have that reflection and the defendant could have that reflection, and likewise that this jury might see that there had been no carelessness or negligence on the part of the defendant which had caused the taking of human life. I should have taken it from the jury then, except for that reason, as I advised the counsel on both sides.

I have gone into this case pretty fully because I think the plaintiff is entitled to have my views. They may be wrong, and I do not undertake to say they are not. One of the reasons why I prefer to sit in nisi prius court is because I am conscious of the fact that if the court is wrong there is a way to remedy it; and, even if he is reversed, he would rather feel that the parties to the cause had gotten justice notwithstanding any mistake he had made, rather than feel any regret that he should have been reversed.

If this jury were to find a verdict on the testimony in this case, in three minutes or in three hours, I would not let it stand, because the testimony is so perfectly overwhelming to my mind, as I see it, that I would not be justified, on any condition whatever, in allowing this case to go to the jury, as reluctant as I am ever to take a case away from the jury.

For the reasons I have endeavored to suggest, I feel compelled to grant the motion of the defendant in this case and will instruct the jury to return a verdict for the defendant.

Harry M. Clabaugh, Chief Justice.