## LYON et al. v. DAVIS.

### No. 6898.

United States Court of Appeals for the District of Columbia.

Argued Nov. 12 and 15, 1937.

Decided Jan. 3, 1938.

Alvin L. Newmyer and David G. Bress, both of Washington, D. C., for appellants.

W. Gwynn Gardiner, I. Irwin Bolotin, and Charles I. Kaplan, all of Washington, D. C., for appellee.

Before GRONER, STEPHENS, and MILLER, Associate Justices.

GRONER, J.

This is an appeal from a judgment for plaintiff-appellee in an action for wrongful death. Appellee is the administratrix of the estate of her deceased son, Frederick Davis, who at the time of his death was 17 years of age. The injury resulting in his death occurred December 29, 1933. Appellants were sued as the owners of a three-story and basement store building located in E street, Washington city. There is a freight elevator in the building, and the deceased came to his death as the result of walking in the dark into the elevator shaft and falling from the first floor to the basement. Appellants acquired the property October 6, 1932, through a foreclosure sale under a defaulted mortgage. Prior to foreclosure the property belonged to Leopold Baumgarten, who conducted a rubber-stamp business on the first floor of the premises. The two upper stories were leased to one Ruzicka, engaged in the bookbinding business. Baumgarten continued in possession of the first floor of the property from October, 1932, to January or February, 1933, at which time he was dispossessed, presumably, in an unlawful detainer proceeding. From thence until after the accident, nearly a year later, the first floor remained vacant. The building had two entrance doors, one leading into the first floor proper, the other into a hallway, where there were steps leading to the second floor. The bookbindery tenant used the hall entrance but was furnished with a key to a door located in the hallway and leading into the main floor. For two or

three years prior to his death deceased had been employed as a messenger for a delivery and messenger business. He was accustomed about once a month to deliver books to the book bindery. The most of the time he would deposit the books on the elevator on the main floor, whence they were hauled up by the employees of the bindery to the second and third floors. On the first floor the elevator shaft was enclosed, and at the front there was a gate or door on hinges which swung outward. Within the shaft there were horizontal doors which were supposed to work automatically and close the shaft when the elevator was not at the first floor. On some of the occasions when deceased went to the building the elevator was at the first floor, on other occasions it was at one of the other floors. When the elevator was at the first floor the "swinging door or gate leading to the elevator shaft" was sometimes open. Precisely what was the situation with respect to the horizontal doors on those occasions the record does not make clear. On the day of the accident one of the two horizontal doors was broken and tied up and the gate was open—thus leaving one-half of the shaft exposed. On that day deceased was sent with Clyde Wilson, another messenger, to deliver a load of books at the book bindery. They reached the place between 5 and 5:30 p. m., and found the woman in charge of the bindery just leaving the building. She opened the door into the hall entrance, and, according to appellee's witness, she also opened the inner door. Deceased entered the building in advance of the other messenger, and, with their arms laden with books, they passed through the inner door and into the room, intending to deposit the books on the elevator, about 45 feet away. The store was unlighted and in complete darkness. As they proceeded toward the elevator, deceased said to his companion, "Watch your step—I don't know whether the elevator is here or not." The other messenger replied to him, "Watch yourself," and immediately afterwards deceased stepped over into the shaft, sustaining the injuries from which he died.

The declaration contains two counts, the first based on common-law negligence; the second on the violation of a municipal elevator ordinance. Apparently the case was tried to the court and jury on the second count. This count charged, among other things, that the appellants violated the elevator regulations requiring the installation of automatic gates and protective devices around the elevator shaft.

Seventeen errors are assigned, but, in the view we take of the case, we need only notice those which relate to the charge of the court to the jury as to the effect of the municipal elevator ordinance and regulations.

To sustain her case appellee introduced certain regulations concerning elevators and a letter or notice sent by the chief elevator inspector to Baumgarten, the former owner of the building, in connection with the regulations. The situation was shown as follows:

Effective May 1, 1930, certain municipal regulations concerning the construction, repair, and maintenance of elevators in the District of Columbia became operative. Rule 12 of the regulations provided: "After the date on which these regulations become effective, all new construction, reconstruction, alterations, and repairs shall conform to its provisions. Equipment installed prior to that date need not, however, be modified to conform to these regulations except where required by the key figures. These key figures are indicated in heavy type in parentheses after the paragraphs, and their application shall be as defined below * * *"

There followed here several symbols, one of them being (o), which signified that paragraphs of the regulation marked by that symbol were to be applied to existing installations "on or before such dates as specified by the Inspector of Buildings." Rule 611, dealing with what are called hoistway gates, provides:

"(a) Landing openings in existing handpower elevator enclosures shall be protected with doors conforming to the requirements of Rule 610 above or shall be provided with safety gates conforming to the requirements of this rule * * * (o)"

"(f) The hoistway gates shall be arranged so that unless the car platform is at or near the landing the gate cannot be opened from the landing side except by a key or special mechanism. (o)"

The obvious purpose of 611(a) and (f) was to provide for the installation of gates that would be self-closing, so that when the elevator was at another level the gates would not be open—as was true in the instant case.

The elevator in appellants' building, which had been installed prior to May, 1930, was not provided with safety devices such as the regulations required, and by reason of the key number (o) following the sections quoted above it did not become the duty of the building owner to make the necessary installations until ordered to do so on a date specified by the inspector of buildings. There was no proof—and it is not contended—that appellants were ever directly notified to fix their elevator. All that the evidence shows is that an inspector from the District offices looked over the elevator while Baumgarten was owner of the building and thereafter notified him to make certain changes to conform to the regulations, allowing sixty days for compliance. Baumgarten did not make the changes, and the elevator was in the same condition when appellants acquired the building at foreclosure in October, 1932, as it had been all along. And this brings us to the only question which we shall decide, namely, Conceding that appellants were bound by the regulations whenever the regulations were made applicable to the elevator in their building as of a particular time, were they also so bound when such specification had not been made to or communicated to them?

Appellants contend, of course, that they are not charged or chargeable with constructive notice of something that went on between the inspector's office and the former owner of the property, and that the regulations and the letter of notification to the former owner were not admissible since the former by their very terms depend for their life upon the latter and the latter is not a public record of which they are chargeable with constructive notice. Appellee argues on the other hand that rule 611 was a contingent regulation; that, while it is true it was ineffective until made effective by an act of the inspector, the act upon which the efficacy of the regulation depended was performed by the inspector; and that the question is not whether appellants had notice, actual or constructive, but whether the regulation was in force or was not. Appellee, therefore, urges that, since the inspector specified a date on which rule 611 was to become effective as to the particular elevator in question, it is just as if the regulation had been specifically amended to require the repair of that elevator. But there is nothing to sustain this argument.

The section conferring power on the Commissioners is section 37 of title 20, D.C.Code 1929, and provides: "The Commissioners of the District of Columbia are hereby authorized and directed to make and publish such orders as may be necessary to regulate the construction, repair, and operation of all elevators within the District of Columbia."

Whether the words "and publish" mean publication in a newspaper is left in doubt and need not be decided. But, even if the words be construed to authorize some other mode of publication, the answer here would be that there is no evidence of any sort of publishing, for the mailed notification to the former owner cannot be regarded as a compliance with the provision. Again, the quoted provision undoubtedly has relation to general regulations and not to a specific instance as is the case here.

When the question arose in the progress of the case the trial judge was at first disposed to think, and so advised counsel, that the letter of the chief elevator inspector specifying the date on which the new installations should be completed was in itself an amendment to the regulation which made it the duty of subsequent owners to obey its terms and see that the protecting devices around the elevator were equipped in accordance with the notice; in other words, that notice to the former owner—being in effect a part of the regulations—was notice to all subsequent owners and bound them as fully as the regulations themselves, and just as if the notice had been given to them in turn. But, when the judge came to charge the jury, he had changed his opinion, for he said that whether or not these regulations applied depended upon whether or not the inspector of elevators had designated certain changes or repairs to be made and had brought notice of this to the attention of the owner. This, he said, arose, first, out of the fact that the elevator ordinance was not applicable to an elevator constructed prior to May 1, 1930, and that, as to such an elevator, notice of changes in construction was necessary to the owner to bring the regulations into effect. As to the correctness of this we think there can be no doubt. Continuing, he said that, if it was shown that the inspector had written to Baumgarten as then owner of the property, notifying him to make certain repairs, and he failed to comply with the demand,

the court would as a matter of law have been obliged to hold that Baumgarten would in that case have been liable to respond in damages for an injury occurring as a result of the failure to comply with the notification. Turning, then, to the duty of appellants, who, as we have seen, acquired the property at foreclosure after the notification to Baumgarten, and as to whom no evidence was offered to show any subsequent notice of any character or any knowledge of the previous demands on the part of the building inspector's office as to repairs or new installation, the court said:

"It has been testified to here that this letter came out of the office of the inspector of buildings; that it was a letter or memorandum of an inspector. Whether they say that the records of that office are public records or not, the court advises you that they are public records; and that they are accessible, that is, if you believe the testimony of the witnesses, to an owner of a building that they have reference to; and that they could see them.

"If that is a fact, the court instructs you as a matter of law that when these defendants became the owners of that building, they had constructive notice by reason of the records in the office of the inspector of buildings that there had been a designation or direction that that elevator should be made in some respects as specified to comply with these regulations. If you find that to be a fact, the court says that that was notice to these defendants that that elevator should have been made to comply with the regulations insofar as they were referred to in that letter. If you find those facts to be facts, then it was notice to these defendants just as though the inspector, after they acquired the building, had written them a notice that under regulations so and so of the building inspector's office he would give them thirty days in which to do whatever the memorandum or designation directed to be done."

We think what the court said, coupled with the illustration of what would have been the liability of Baumgarten had he continued to be the owner of the premises, was in effect a peremptory charge to the jury. It was in effect that appellants were bound to comply with the elevator regulations—which as we have already pointed out were by the terms thereof not to apply except upon notice—irrespective of any actual knowledge or notice to comply therewith, and that upon failure to comply they were liable, without more, for a resulting injury. Aside from the peremptory effect of the instruction, we think the court erroneously charged the law. For, if the letter was not a public document from which constructive notice to the public could be said to flow, there was nothing else in the form of notice to take its place; and, since concededly notice was necessary to make the regulations effective, the admission of evidence as to what occurred between the inspector's office and the former owner, together with the court's interpretation of its effect, was prejudicial error.

Constructive notice from records is a creation of statute, and, generally speaking, in the absence of a statutory provision, public records—merely because they are such—carry no notice to the public. There is no such statute in the District of Columbia. The letter notifying Baumgarten to make repairs to the elevator was neither more nor less than a part of the correspondence file of the chief elevator inspector's office. The notice itself would, so far as appears, have been just as effective if it had been given verbally. Its preservation in the files of the inspector's office was a matter of convenience for reference purposes and to meet the necessities of proof of the fact of notice; but there is nothing either in the act conferring authority on the Commissioners or anywhere else in the statutes, so far as we have been able to find, which can make the letter anything more than notice to the persons immediately concerned. Even if it be granted that the letter was a public record, it is so only as a record of an act done by a public officer in the discharge of an official function. As such, perhaps, it was open to public inspection, but this fact is entirely beside the question whether appellants were charged with constructive notice of its existence and contents. For a paper to be a public record is one thing. For it to give notice to the world is quite another. It was, therefore, improper to tell the jury that the letter was a public record of the terms of which appellants had constructive notice and that consequently they had a duty to comply with its terms.

In the District of Columbia there are Code provisions providing for recordation and specifying who shall be bound in the

case of deeds, mortgages, and other instruments, including chattel mortgages and conditional sales contracts. There is also a provision relating to zoning which requires the filing of maps and regulations concerning established zones in the office of the Engineer Commissioner of the District and providing likewise for publication in the newspaper of zoning orders and regulations. D.C.Code 1929, title 25, § 527. But, as we have already pointed out, none of this is applicable to the present situation but rather contrasts with it. Here, as we have seen, we have admittedly no actual notice and—since there is no statutory provision on the subject—no constructive notice. What is actual notice and what constructive notice has been so often defined by the courts that it would be a useless task to discuss it here. Cases directly in line with what we have said on the subject are: Burck v. Taylor, 152 U.S. 634, 654, 14 S.Ct. 696, 703, 38 L.Ed. 578; Mayor, etc., of City of Baltimore v. Whittington, 78 Md. 231, 27 A. 984; Charles v. Roxana Petroleum Corporation, 8 Cir., 282 F. 983; Ex parte Caplis, D.C., 275 F. 980; Dunn v. City of New York, 205 N.Y. 342, 98 N.E. 495; Union Trust Co. v. Hendrickson, 69 Okl. 277, 172 P. 440, 442. In the first above cited case the Supreme Court said: "If notice was essential to charge them [the defendants], actual notice should have been given, at least in the absence of a statute providing some means for constructive notice."

Appellee relies upon cases like McRickard v. Flint, 114 N.Y. 222, 21 N.E. 153, and Catts v. Smyrna, 10 Del.Ch. 263, 91 A. 297.

In the first named case the statute of New York, Laws 1874, c. 547, § 5, provided that: "In any store or building in the city of New York in which there shall exist or be placed any hoistway, elevator, or well-hole, the openings thereof, through and upon each floor of said building, shall be provided with and protected by a substantial railing, and such good and sufficient trap-doors with which to close the same as may be directed and approved by the superintendent of buildings."

The court in that case merely held that compliance with the statute was not dependent upon the direction and approval of the superintendent, but that the duty was actively imposed upon building owners, requiring them to provide railings and trapdoors first and to seek approval afterwards. The case might be authority here if the elevator in question had been built after May 1, 1930, for then the builder would have been compelled to comply with the regulations without notice from the inspector; but, as we have already seen several times, the terms of the ordinance in the District of Columbia were made applicable to previously constructed elevators only after notice to comply had been given. And this, of course, brings us back to the answer which we have already made, namely, that appellants here did not know actually—and should not have been held to know constructively—that notice had been given.

The second case involved a street paving assessment. The charter of the municipality provided that abutting owners should be notified to make certain improvements, and, if they failed, the improvements might be made at their expense without notice. The town council passed an ordinance directing the work to be done, and notice was served on the then owner of the land. The work was commenced, and during its progress the owner died, and it was held that the heir of the owner could not defeat the assessment on the ground that he was not given additional notice, the court holding that he took the land subject to the prior notice. But the rule in that case has no application to this. There the municipal action related to street improvements and was a matter of public record done pursuant to statute,—a situation analogous to zoning laws as to which the statute affects the public with notice of the regulations, but wholly dissimilar to the situation we have here.

Appellants rely in part on such cases as Levy v. Vaughan, 42 App.D.C. 146, and Prigg v. Lansburgh, 5 App.D.C. 30. Those cases are not in point because the records there were excluded simply on the ground that what they contained was hearsay. But appellants' contention is sustained by Dunn v. City of New York, supra, and Union Trust Co. v. Hendrickson, supra, which present situations substantially similar to the facts here. Those cases held, as we hold, that "constructive notice is a statutory creature, and, in the absence of a statute making the record of a public office constructive notice, such record is not notice to persons dealing with the subject-matter to which such records have reference." Hence we are compelled to hold that, in the absence of a statute mak-

108

ing it necessary to publish or to file for record a notice issuing out of the office of the inspector of buildings, such records as may be made and filed by him do not give constructive notice to a subsequent purchaser of the building to which the record referred, and, therefore, that the charge of the court to the contrary was error for which the judgment must be set aside and the case remanded for a new trial.

Much of the argument in this court and a large part of the briefs of counsel were taken up with the discussion whether or not there should have been in this case a directed verdict on the ground of contributory negligence. That question, in the facts disclosed, is a close one, and, since the case must be reversed on the ground discussed above, and since also the evidence may be different on a new trial because plaintiff will be claiming breach of a common-law duty, we have thought it not necessary or proper to pass upon the question.

Reversed and remanded.