Creola QUICK, Administratrix, Estate of Lawrence Quick, Deceased, Appellant

v.

Roger G. THURSTON, Appellee.

No. 15738.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 7, 1961.

Decided April 20, 1961.

Edgerton, Bazelon and Fahy, Circuit Judges, dissented.

Mr. Benjamin F. Rossner, Washington, D. C., with whom Mr. Jesse O. Dedmon, Jr., Washington, D. C., was on the brief, for appellant.

Mr. J. Joseph Barse, Washington, D. C., with whom Messrs. James A. Welch, H. Mason Welch, J. Harry Welch, Arthur V. Butler and Walter J. Murphy, Jr., Washington, D. C., were on the brief, for appellee.

Before WILBUR K. MILLER, Chief Judge, and EDGERTON, PRETTYMAN, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN, and BURGER, Circuit Judges, sitting en banc.

BURGER, Circuit Judge, with whom WILBUR K. MILLER, Chief Judge, and PRETTYMAN, WASHINGTON, DANAHER and BASTIAN, Circuit Judges, join.

In this action for wrongful death the District Court directed a verdict for the defendant at the close of plaintiff's case. On the evening of June 4, 1957, the decedent, Quick, visited the appellee, Dr. Thurston, to obtain relief from urine retention; he had long suffered from diabetes and urethral stricture. The treatment consisted of the insertion of certain instruments into the urethra to relieve the stricture and the administration of penicillin as a safeguard against infection. The urine drained during the treatment showed the presence of infection in the lower urinary tract, which was to be expected in view of the abnormal urinary retention. The decedent returned home after the treatment which was administered between 10:00 and 11:00 P.M.

During the night the patient developed chills, high temperature and began hemorrhaging. His wife called the doctor's house at 4:00 A.M. and again at 6:00 A.M., but on both occasions the doctor's wife refused to awaken him. A call at

9:00 A.M. reached the doctor and he prescribed additional antibiotics which were promptly delivered to decedent's home. Meanwhile, Mrs. Quick had called a relative who also was a physician. This physician countermanded Dr. Thurston's directive for additional antibiotics and instead recommended immediate hospitalization. At the hospital the urethral stricture was relieved by the insertion of instruments and specimens showed septicemia (blood-poisoning) due to a proteus organism. Eleven days later the patient died.

The pretrial proceedings in the action for wrongful death framed four elements of negligence: (1) Failure to determine whether the decedent was in a condition to undergo treatment; (2) Failure to administer antibiotics prior to treatment; (3) Failure to provide proper post-treatment care; (4) Use of unsterile instruments.

Appellant does not suggest that the record contains evidence sufficient to warrant submission of the first allegation of negligence to the jury. With respect to the second allegation, there was no evidence that proper medical practice required administration of antibiotics before, rather than immediately after, the urethral manipulation. Moreover, there was no evidence that prior administration would have prevented the infection. Appellant's case on appeal rests primarily upon alleged abandonment, use of unsterile instruments, and *res ipsa loquitur*.

█ █ In an action for malpractice the burden is on the plaintiff to establish that the defendant did not exercise "that degree of care and skill ordinarily exercised by the profession in his own or similar localities." Rodgers v. Lawson, 1948, 83 U.S.App.D.C. 281, 282, 170 F.2d 157, 158; Prosser, Torts § 31 (1955). Here the plaintiff failed to introduce any evidence of the standard of care in support of the allegations of abandonment. No testimony was offered to show that the standard of medical care in the community would require an earlier response by the doctor. Thus the jury was left without means to determine whether the doctor was negligent in not responding to the earlier calls, and the trial court correctly directed a verdict for the defendant on this issue. Cf. Rodgers v. Lawson, supra. Moreover, even if such evidence had been introduced, plaintiff's evidence failed to establish that the doctor's delay in answering in any way contributed to the death of Mr. Quick. Indeed, plaintiff's medical expert stated that he could not express an opinion whether speedy treatment of this condition generally tended to bring such an infection under control. In this state of the evidence the jury could not have determined whether the absence of medical treatment during the night contributed to the death, for it could not be determined whether earlier treatment would have had any beneficial effect. Moreover after the appellee had prescribed and arranged for additional antibiotics there intervened the judgment and decision of another doctor who countermanded appellee's direction to administer the antibiotics. On this record, the direction of a verdict for the defendant on the claim of abandonment was compelled by the failure of proof on both aspects of liability—negligence and causation.

The final claim of negligence, upon which plaintiff relies heavily, is the use of instruments which appellant alleges were unsterile. Specifically, appellant cites the testimony of her medical witness that "the urethral manipulation did cause this septicemia" and that the proteus organism "could have been introduced at that time, and from the course of events, most likely was." Taken by itself, without analysis, this testimony might have given the impression that Dr. Maganzini expressed an opinion that the proteus organism was in fact introduced by unsterile instruments. But the full context and further statements of the doctor demonstrate that such was not his meaning. Appellant's witness makes it plain that the "urethral manipulation" he referred to was the treatment given and he explained that the history of urethral stricture as well as the cultures developed from specimens taken

after the decedent entered the hospital indicated a chronic infection of the urinary tract. Furthermore, he explained that the most likely source of the proteus organism was "a local source in the lower urinary tract, bladder, prostate, urethra, something of that nature." In other words the treatment itself, not the manner of its administration, was inherently capable of aggravating or diffusing the pre-existing infection. He then explained that when he testified that the proteus most likely was "introduced at the time of the urethral manipulation," he meant only that "the injury done to a urethra that is narrowed, by the passage of an instrument, makes it very susceptible for infection to develop, and it also, by virtue of opening up certain blood vessels, allows a place for these organisms to enter the blood stream readily." Thus his testimony was that the proteus organism was introduced into *the blood stream* at the time of the manipulation, not that it was brought *into the body* at that time. He specifically testified that he was *not* saying that unsterile instruments introduced the proteus organisms into Mr. Quick's system. The evidence is unequivocal on this point.

At best the testimony most favorable to appellant was that there were two possible theories as to source of the infection: unsterile instruments or the chronic infection already present in the lower urinary tract. Obviously, the jury could not be allowed to guess that the former was the source when appellant's own medical expert could not express an opinion to that effect. On the other hand, if it be assumed that the infection spread from a source in the urinary tract, a finding of negligence could only be predicated upon expert testimony that the procedure used by Dr. Thurston was improper in view of the symptoms of chronic infection. No such testimony was offered. Indeed, Dr. Maganzini testified that similar treatment was employed when decedent reached the hospital, and that breaking the stricture to open the urethral canal "is the simplest and the usual procedure." Thus, there was a total absence of any evidence from which the jury could have concluded that the instruments were unsterile or that the doctor was negligent in performing the treatment, or that he should not have performed the treatment.[1]

Plaintiff suggests that the doctrine of *res ipsa loquitur* may fill this gap in the evidence. That doctrine, of course, is a common sense rule which allows an inference of negligence where the occurrence complained of ordinarily would *not* happen in the absence of negligence. See Safeway Stores, Inc. v. West, 86 U.S.App.D.C. 99, 180 F.2d 25, certiorari denied, 1950, 339 U.S. 952, 70 S.Ct. 840, 94 L.Ed. 1365; Prosser, Torts § 42 (1955).

There is no basis, in the record or in common experience, to warrant an inference that infection—or the spread of infection—follows this treatment only if there is negligence. The testimony of appellant's expert, Dr. Maganzini, discloses that there was an equal possibility that the treatment—as to which no negligence is shown—merely allowed germs already present in decedent's lower urinary tract to pass into the blood stream. The record shows decedent had long suffered from chronic pylonephritis or infection of the kidney. Dr. Thurston testified that the urine drained from decedent by the treatment, which was the usual way to relieve his condition, showed a kidney infection which was to be expected in view of the abnormal urinary retention. Thus, undisputed medical testimony shows us that negligence was not the only potential source of infection but simply one of several. Appellant's expert in turn confirmed this.

Due to the great variety of infections and complications which, despite

---

1. While we reach our conclusion independent of the testimony of Dr. Thurston, we note that when he was called as a witness for appellant he testified that his instruments were sterile, that the treatment was necessary, and that it was carefully performed.

all precautions and skill, sometimes follow accepted and standard medical treatment, courts reject the notion that because infection follows a treatment an inference of negligence is to be made. Moore v. Belt, 1950, 34 Cal.2d 525, 212 P.2d 509; Tallon v. Spellman, 1939, 302 Mass. 179, 19 N.E.2d 33. We think that rule sound. Moreover, it should be noted that here an infection preceded the operation and the operation of necessity invaded the infected area. Any suggestion that the proteus infection was a new infection and therefore one which must have been caused by external factors is totally without support in the record.[2] Only recently this court approved the ruling of the trial judge that the doctrine of *res ipsa loquitur* does not apply to a situation fairly comparable to that presented by this record. Johnston v. Rodis, 1958, 102 U.S.App.D.C. 209, 251 F.2d 917. See also Hohenthal v. Smith, 1940, 72 App.D.C. 343, 114 F.2d 494; Sweeney v. Erving, 1910, 35 App.D.C. 57, 43 L.R.A., N.S., 734, affirmed 1933, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815; Ayers v. Parry, 3 Cir., 1951, 192 F.2d 181; Prosser, Torts § 31, at 134, § 42, at 210 (1955).

The important public policy considerations inherent in this situation were pointed out by Chief Justice, then Circuit Judge, Taft:

> "If the maxim, 'Res ipsa loquitur,' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.'" Ewing v. Goode, C.C.S.D.Ohio 1897, 78 F. 442, 443.

We have examined the other contentions of the appellant and find no error.

The judgment of the District Court was correct and is affirmed.

Affirmed.

EDGERTON, Circuit Judge, whom FAHY, Circuit Judge, joins (dissenting).

I think the District Court erred in directing a verdict for the defendant at the close of the plaintiff's case.

On June 4, 1957, appellee treated the deceased for retention of urine. Treatment included insertion of instruments and a drug into the urethra. On June 16 the patient died. According to the death certificate, death was caused by multiple lung abscesses due to proteus septicemia. This is an infection of the blood.

On June 5, the day after the treatment, the patient was admitted to Mount Alto Hospital. Dr. Maganzini of the hospital was called as a witness by the plaintiff. He testified that his "tentative diagnosis or impression was that [the patient] had septicemia probably due to urethral manipulation * * *." He was asked: "Can you state with reasonable medical certainty, based on the history, physical examination, and the culture and lab work, what in your opinion caused Mr. Quick's condition * * *?" His first reply was: "I think most likely the manipulation". A moment later he spoke more positively: "My opinion is that it did, that the urethral manipulation did cause this septicemia."

Counsel asked "Is there any conclusion to be drawn from finding the bacteria in both the urine and the blood?" Dr. Maganzini replied: "Being the same species of bacteria it would be most likely that they came from the same place." Counsel then asked: "based on the history in your examination, the diagnosis you made when Mr. Quick entered the hospital and also the diagnosis made based on the cultures, can you express an opinion

---

2. The dissenting opinion relies on a "concession" attributed to appellee's counsel in oral argument, but if we accept this "concession" as the dissent states it, it means nothing more than that

"*if* the treatment was not sterile," liability might follow. But there is not a scintilla of evidence that the treatment was unsterile.

as to whether or not the proteus was introduced by manipulation of the urethral tract of Mr. Quick on June 4th, 1957?" The witness replied: "Yes, I can express an opinion. * * * That it could have been introduced at that time. * * * I think it could have been introduced at that time, and from the course of events, most likely was."

Cross-examination included this colloquy: "Q. Doctor, I think you answered one of Mr. Rossner's questions and said that it was your opinion that probably the proteus that was found in the urine cultures and the blood cultures came from the same source. Is that correct? A. That's right. * * * Q. What was the source, in your opinion? A. Most likely, I would think, a local source in the lower urinary tract, bladder, prostate, urethra, something of that nature." Actually the doctor had said "from the same place." That he now accepted defense counsel's paraphrase, "from the same source", does not suggest he meant anything more than when he had said "place"; that the proteus which was found in the urine and the blood probably came to the urine and the blood from "the lower urinary tract, bladder, prostate, urethra, something of that nature." That the proteus was present in this "local source" when the specimens of urine and blood were taken at the hospital did not show, and the witness did not suggest that it showed, that the proteus was present before Dr. Thurston treated the patient. Dr. Thurston treated the patient on June 4. The specimens were taken on or after June 5.

On cross-examination Dr. Maganzini accepted defense counsel's suggestion that it was "possible" the proteus were "present in either the kidney, the bladder, the prostate or the urethra before any manipulation was performed". Council then suggested, but did not succeed in getting the witness to agree, that they "probably" were present before any manipulation was performed. The witness replied to this suggestion: "I can't say that they were. I think that they could have been * * *." He accepted

counsel's suggestion that he "cannot say that they were not." Counsel said: "Doctor, you testified that in your opinion the proteus could have been introduced at the time of the urethral manipulation and it most likely was. Into what was the proteus introduced, in your opinion; into the blood system, is that correct?" The witness replied: "I think most likely introduced into the blood at that time." He was not asked and did not say whether he thought the proteus was most likely introduced into the blood at that time from sources outside or inside the body.

Counsel asked: "You are not saying, are you, Dr. Maganzini, that it is your opinion that these proteus organisms were introduced into Mr. Quick's system by unsterile instruments?" He replied: "I am not." He expressed no opinion about the condition of the instruments.

He said: "the injury done to a urethra that is narrowed, by the passage of an instrument, makes it very susceptible for infection to develop, and it also, by virtue of opening up certain blood vessels, allowed a place for these organisms to enter the blood stream readily." The judge asked him: "You mean, organisms are already in situ?" He replied: "Either in situ or introduced."

Counsel asked: "If a patient is bothered with retention and cannot pass his urine, due to a urethral stricture, the only way to relieve him is to break or pass the stricture to open the urethral canal; is that correct?" He replied: "It is the simplest and the usual procedure", and said the same procedure was followed in the hospital on June 5.

The defendant, Dr. Thurston, was called by the plaintiff as an adverse witness. He testified in detail, chiefly on cross-examination by his own counsel, that his instruments and gloves and entire procedure were sterile. There was no other direct testimony either way on this point. He saw pus cells in the urine that he drew off, and this indicated the presence of "infection". He said nothing about the possible nature of this infection. He did not suggest that it might be

related to the proteus septicemia that caused death.

The evidence as a whole could not fairly be thought to prove beyond a reasonable doubt that the fatal proteus septicemia was caused by negligence of the defendant. If this had been a criminal trial, therefore, the judge would have been right in directing a verdict. But I think he erred in directing a verdict in this civil trial, because in my opinion the evidence might well be thought by a jury to prove that the fatal proteus septicemia was *probably* caused by negligence of the defendant. There are two parts to this question. The first part is, might the jury fairly have found that appellee's treatment probably introduced the proteus into the man's body? This question is close, but in the light of Dr. Maganzini's other testimony I think his statement that the proteus most likely was "introduced at that time" would support such a finding. He contrasted "in situ" with "introduced". A jury might reasonably think that this did, or that it did not, show that when he used the word "introduced" alone, he meant introduced into the body and not *merely* into the blood stream. The jury should have been allowed to decide which he meant.

The second part of the question is, might the jury fairly have found that *if* the treatment introduced the proteus into the man's body, the treatment was probably negligent? This does not appear to me to be at all close. The answer is so clearly yes that in oral argument, in response to a question from the bench, appellee's counsel conceded this second point. The answer is clear because if the treatment introduced the proteus into the man's body, the treatment cannot have been sterile. A jury might well find that if the treatment was not sterile, it was probably negligent.

"Generally speaking, direct and positive testimony to specific acts of negligence is not required to establish it. Circumstantial evidence is sufficient, either alone or in combination with direct evi-

dence." Christie v. Callahan, 75 U S. App.D.C. 133, 147, 124 F.2d 825, 839. In that case this court held a physician liable for a severe X-ray burn inflicted on a patient. Concerning an earlier X-ray case, Sweeney v. Erving, 35 App.D.C. 57, 43 L.R.A.,N.S., 734, affirmed 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815, this court said: "Defendants rely upon this case strongly, asserting it holds that negligence in X-ray treatment can be shown only by direct testimony of X-ray specialists. But the opinion expressly states: 'There are exceptional cases where the result of an operation performed, if unexplained, may warrant an inference of negligence,' and cites authorities to sustain this view." 75 U.S.App.D.C. at page 136, 124 F.2d at page 828.

If a physician or surgeon acts in accordance with the accepted procedure of his time and place, he is not negligent. But it is an understatement to say a jury might reasonably think unsterile treatment is not in accordance with procedure now accepted in the District of Columbia. The phrase *res ipsa loquitur* " 'is nothing but a picturesque way of describing a balance of probability on a question of fact on which little evidence either way has been presented.' * * * The principle in question is simply that when the cause of an accident is (1) known, (2) in the defendant's control, and (3) unlikely to do harm unless the person in control is negligent, the defendant's negligence may be inferred without additional evidence." Washington Loan & Trust Co. v. Hickey, 78 U.S.App.D.C. 59, 61, 137 F.2d 677, 679. In that case we applied the principle to the unexplained fall of a window ventilator from an office building. We said: "As in other civil cases, a balance of probability is enough." Ibid. "In many cases the inference to be drawn is a double one, that the accident was caused in a particular manner, and that the defendant's conduct with reference to that cause was negligent." [1]

"The plaintiff is not required to eliminate all other possible causes, or infer-

---

1. Prosser, Torts (1955), § 42, p. 204, and cases cited.

ences; and all that is needed is evidence from which reasonable men can say that on the whole it is more likely that there was negligence associated with the cause than that there was not. * * * "[2] Undoubtedly, operations have sometimes caused infections without negligence on the part of the operator. For example, a properly qualified and trusted nurse may be careless. But Dr. Thurston was the only person who appears to have had anything to do with the operation in this case. And *"res ipsa loquitur* 'means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; * * * that they make a case to be decided by the jury, not that they forestall the verdict * * *.'" Jesionowski v. Boston & Maine R. Co., 329 U.S. 452, 457, 67 S.Ct. 401, 91 L.Ed. 416.

I have found no case in the Supreme Court or this court, and not many cases elsewhere, either accepting or rejecting the *res ipsa* principle regarding an operation claimed to be the cause of an infection. The opinion of the court in the present case says: "Only recently this court approved the ruling of the trial judge that the doctrine of *res ipsa loquitur* does not apply to a situation fairly comparable to that presented by this record." The court then cites Johnston v. Rodis, 102 U.S.App.D.C. 209, 251 F.2d 917. The situation in Johnston does not seem to me comparable to that presented by this record. That case involved no infection. The plaintiff Johnston made no claim that she had suffered any infection. Her only claim was that an electric shock treatment caused her to break her arm.

In Hohenthal v. Smith, 72 App.D.C. 343, 114 F.2d 494, which this court cites, the plaintiff was infected by an operation but the defendant was not the man who performed it.

When sterile procedures were unknown, infections often resulted from operations performed in accordance with standards then accepted. But probably no one would contend, unless in making a legal argument, that infections often result from operations performed in accordance with standards now accepted. Rejection of *res ipsa* in the present circumstances seems to me an anachronism.[3]

If a jury found for the plaintiff, it would be "no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference." Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916.

BAZELON, Circuit Judge (dissenting separately).

I agree with Judge Edgerton's analysis of the testimony. And having in mind that we must view the record most favorably to plaintiff, I think it does not provide a provident basis for directing a verdict in favor of the defendant at the close of plaintiff's case. But this does not foreclose the possibility that such a basis may appear after defendant puts in his case. Cf. Loketch v. Capital Transit Co., 1957, 101 U.S.App.D.C. 287, 289, 248 F.2d 609, 611, citing Peigh v. Baltimore & O. R. Co., 1953, 92 U.S.App.D.C. 198, 202, 204 F.2d 391, 396, 44 A.L.R.2d 671.

2. Ibid.

3. By way of analogy: The "earlier cases dealing with aviation took the position that there was not yet such common knowledge and experience of its hazards as to permit * * * a conclusion from the unexplained crash of a plane. It is only the more recent decisions which have held that the safety record now established justifies the application of *res ipsa loquitur*. There has been much the same history in the law of exploding beverage bottles; and the great majority of the courts now hold that even a single bottle is enough to permit a finding of negligence." Prosser, Torts (1955), § 42, pp. 203-4.