**David E. HENDERSON, Appellant,**

**v.**

**Louis MILOBSKY.**

**No. 76–1726.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 10, 1977.

Decided June 9, 1978.

Edward DeV. Bunn, Washington, D. C., for appellant.

Francis L. Casey, Jr., Washington, D. C., with whom Terry Michael Banks, Washington, D. C., was on the brief, for appellee.

Before BAZELON, LEVENTHAL and ROBINSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBINSON.

Opinion concurring in part and dissenting in part filed by LEVENTHAL, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

We review here the District Court's grant of a directed verdict for a dental surgeon in a malpractice suit brought by a patient. We agree with the court that the patient failed to make out a prima facie case of actionable nondisclosure of medical risk within the ambit of our *Canterbury* deci-

sion.[1] We conclude, however, that the jury should have been allowed to determine whether the procedure was executed with due care. We accordingly reverse and remand for a new trial.

## I

In August of 1974, appellant went to the office of a Dr. Aaronson for a routine dental checkup. Dr. Aaronson x-rayed and cleaned appellant's teeth and, because both of his lower wisdom teeth were impacted, referred him to appellee, an oral surgeon. Thereafter, in consultation with appellee, appellant was told that those teeth would have to be removed, and a date for commencement of the process was set. At the appointed time, appellant's right lower wisdom tooth was taken out and, about two weeks later, so was the other. This litigation was bred by events accompanying the first extraction.

For three or four months after that extraction, appellant was totally insensate in his right jaw and lips. Over the next eight or nine months, the numbness diminished somewhat but not completely. At trial, nearly two years after the extraction, sensation remained impaired in an area measuring about a half-inch square just below

the lower right lip.[2] Dr. Harold Stevens, a neurologist, expressed the opinion that this condition—paresthesia—was caused by injury to the alveolar nerve when the wisdom tooth on that side was removed.[3] Appellant testified that he was not told that paresthesia might result,[4] while appellee avowed that he was.[5]

Appellant, charging malpractice in two aspects, sued in the District Court for damages. At the conclusion of his case in chief, the court directed a verdict in favor of appellee. The court concluded, on the one hand, that appellee was under no duty to inform appellant of the risk of paresthesia.[6] On appellant's claim of negligent treatment, the court could find no evidence tending to show any departure from standard dental practice that might have contributed to paresthesia. We analyze these issues in turn.

## II

### A

In *Canterbury v. Spence*,[7] this court subscribed to the principle that a physician's due-care duty to his patient extends to disclosure of "all risks potentially affecting the [patient's] decision" to submit to a medical procedure.[8] The "root premise" for

---

1. *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 464 F.2d 772, *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

2. Trial Transcript (Tr.) 73.

3. Tr. 74. See also Tr. 60, 69 (appellee's testimony). Dr. Stevens explained that the mandibular branch of the trigeminal nerve was involved in the loss of sensation, and that the alveolar nerve is a branch of the mandibular. Tr. 74.

4. Tr. 29.

5. Tr. 41.

6. See Tr. 97.

7. *Supra* note 1.

8. 150 U.S.App.D.C. at 278, 464 F.2d at 787. In *Canterbury* we dealt with a physician who had neither explained the risk in question nor warned of it. Thus, although our discussions both there and here use as shorthand the phrase "duty to disclose," we do not mean to

imply that a medical-arts practitioner may not fulfill his disclosure obligation by *offering* to elucidate the purpose and nature of the proposed treatment, the alternatives and the risks. See Goldstein, *For Harold Laswell: Some Reflections on Human Dignity, Entrapment, Informed Consent, and the Plea Bargain,* 84 Yale L.J. 683, 691–692 (1975). Because "the patient's right of self-decision shapes the boundaries of the duty to reveal," *Canterbury v. Spence, supra* note 1, 150 U.S.App.D.C. at 277, 464 F.2d at 786, physicians and courts alike must accept the patient's election to know nothing and instead to rely completely upon the physician, as well as his choice to learn everything material to a reasonably informed independent decision, for the patient, as *Canterbury* makes clear, is free to unwisely act in the dark so long as he is exercising his own "right of self-determination." *Id.* at 275, 464 F.2d at 784; accord, *id.* at 271–272, 277–278, 281, 464 F.2d at 780–781, 786–787, 790. See also *Faretta v. California,* 422 U.S. 806, 834, 95 S.Ct. 2525, 2540–2541, 45 L.Ed.2d 562, 581 (1975) (accused has right to defend himself in criminal prosecution; "although he may conduct his

this obligation is the patient's " 'right to determine what shall be done with his own body . . . ,' " [9] and the need for information bearing on that determination.[10] On the evidence before us in *Canterbury,* we held that whether the physician had unreasonably failed to reveal a highly serious consequence expectable in one percent of all operations of the type performed on the patient was a question for the jury.[11] We reached that conclusion after first adumbrating a "general outline of legal doctrine on the subject" of physicians' negligent participation or failure to participate in patients' medical decisionmaking, but we reserved for future litigation doctrinal refinement newly arising situations would inevitably necessitate.[12]

■ Our only post-*Canterbury* decision in the area is *Haven v. Randolph,*[13] which pivoted on one aspect of a rejected risk-disclo-sure claim. Appellee argues that *Haven* overruled *Canterbury,*[14] but we think it clear that nothing in *Haven* undercut *Canterbury* in the least. Though in *Haven* we affirmed, without discussion,[15] on the basis of a pre-*Canterbury* District Court opinion [16] in some respects inconsistent with *Canterbury,* the District Court had relied on a number of alternative grounds,[17] and our opinion in *Haven* did not specifically approve any particular ground, and certainly no position out of harmony with *Canterbury.*[18]

*Haven* did not, however, add anything really novel to our jurisprudence on risk-disclosure. In result, it merely reemphasized the claimant's burden of showing that the alleged breach of duty to disclose led to the injury for which compensation is sought. In *Canterbury* we had held that when damages are sought for a condition attributed to a medical procedure, causation

own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' *Illinois v. Allen,* 397 U.S. 337, 350–351[, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353, 363 (1970)] (Brennan, J., concurring)"). The keystone, however, is that it is the patient, not the physician or the medical profession, who defines the scope of the pre-decision opportunity to know. Goldstein, *supra* at 694. Only two exceptions to this general principle enable the physician to reasonably conclude not to offer disclosure, and both are quite limited. One is "when the patient is unconscious or otherwise incapable of consenting, and harm from a failure to treat is imminent and outweighs any harm threatened by the proposed treatment." *Canterbury v. Spence, supra* note 1, 150 U.S.App.D.C. at 279, 464 F.2d at 788. The other is when a threat to the patient's well-being from communication of risk information outweighs the hazards of the proposed procedure. *Id.* at 280, 464 F.2d at 789. The threat must be of a direct adverse impact on health—not merely the physician's fear that, if the patient knows, he may make a decision that the physician would deem foolish. *Id.*

9. 150 U.S.App.D.C. at 271, 464 F.2d at 780, quoting *Schloendorff v. Society of New York Hosp.,* 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914).

10. *Canterbury v. Spence, supra* note 1, 150 U.S.App.D.C. at 271 & n.15, 464 F.2d at 780 & n.15.

11. *Id.* at 285, 464 F.2d at 794.

12. *Id.* at 271 n.11, 464 F.2d at 780 n.11.

13. 161 U.S.App.D.C. 150, 494 F.2d 1069 (1974), *aff'g,* 342 F.Supp. 538 (D.D.C.1972). The District of Columbia Court of Appeals has not yet had occasion to speak in this area of law, but we note that other jurisdictions have increasingly adopted the views expressed in *Canterbury.* Seidelson, *Medical Malpractice: Informed Consent in "Full-Disclosure" Jurisdictions,* 14 Duquesne L.Rev. 309, 312 (1976). See also *id.* at 309–311 n.1–2 (breakdown of jurisdictions accepting the rejecting *Canterbury*).

14. We might remind at the outset that one panel of this court does not override the decision of another, *United States v. Caldwell,* 178 U.S.App.D.C. 20, 56 n. 19, 543 F.2d 1333, 1369 n.19 (1974) (supplemental opinion), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), and cases there cited.

15. On the risk-disclosure point, the *Haven* opinion states merely that the panel "re[lied] *primarily* on the findings and reasoning set out in" the District Court's opinion. *Haven v. Randolph, supra* note 13, 161 U.S.App.D.C. at 151, 494 F.2d at 1070 (emphasis supplied).

16. *Haven v. Randolph, supra* note 13, filed one day prior to rendition of our opinion in *Canterbury.*

17. See 342 F.Supp. at 542–544.

18. See note 15 *supra.*

by breach of that duty cannot be demonstrated simply by the claimant's unadorned hindsight-statement that had he known of the risk he would not have consented to the procedure.[19]  *Haven* merely stands for the cognate proposition that when the claimant has not even made such an assertion, the issue of causation cannot possibly go to the jury.

## B

Appellant's complaint is that he suffers from permanent paresthesia of a portion of his face and that the extraction of the first wisdom tooth was responsible therefor. The District Court directed a verdict for appellee at the close of appellant's evidence, apparently reasoning that neither the risk of temporary nor of permanent paresthesia was significant enough to give rise to a duty to disclose.[20]  We affirm that result, but we find it necessary to distinguish the two risks in our analysis.

■  Looking first to potential recovery on the theory of breach of duty to disclose the risk of temporary paresthesia,[21] the starting point, as in any tort action, is the plaintiff's burden of establishing the coalescence of four essential elements:  duty, breach of duty, causation and actual loss.[22] If indeed appellee had a legal responsibility to tell appellant that temporary paresthesia was a hazard,[23] there undisputably was sufficient evidence that the duty went unfulfilled.  But even were we to take another leap of faith—to the conclusion that failure to disclose the risk of temporary paresthesia could be considered legally related to the permanent paresthesia claimed [24]—appellant did not surmount the requirement of causation in fact because it is evident that in actuality he would not have called off the extraction.

■  This case in essence is much like *Haven,* for although appellant said in hindsight that had he known he would have declined to proceed,[25] no reasonable juror could have credited that testimony.[26] Knowing that the first extraction had left him with at least some continuing numbness in his face [27]—the sum and substance of paresthesia—appellant nonetheless made an appointment and returned about two weeks later to have another wisdom tooth removed.[28]  He did not try to explain away this contradiction between assertion and overt conduct, and we—and no less jurors— would be hard put to even imagine how he

---

**19.** *Canterbury v. Spence, supra* note 1, 150 U.S.App.D.C. at 281–282, 464 F.2d at 790–791. See also note 26 *infra.*

**20.** J. App. 97.

**21.** Notwithstanding appellant's specific demand for damages for permanent paresthesia, he may recover more limitedly for temporary paresthesia if the case therefor meets all legal requirements.  See *Pickus v. Board of Parole,* 165 U.S.App.D.C. 284, 287, 507 F.2d 1107, 1110 (1974); *Kahan v. Rosenstiel,* 424 F.2d 161, 174 (3d Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); Fed.R.Civ.P. 54(c). See also note 24 *infra.*

**22.** *E. g.,* W. Prosser, Law of Torts, § 30, at 143 (4th ed. 1971).

**23.** See text *infra* at notes 33–34.

**24.** Whether appellant's paresthesia is to any extent permanent, in the sense that it will never disappear completely, remains an open question on the present record.  The evidence at trial demonstrated its persistence two years after the extraction, but appellee opined that it might linger for as much as three and testified that he had never encountered paresthesia more enduring than that.  J. App. 59.  Dr. Stevens, the only other expert witness, expressed no view on permanence.  J. App. 73–74.

**25.** J. App. 39.

**26.** The situation at bar exemplifies the very concern we identified in *Canterbury.*  150 U.S. App.D.C. at 281–282, 464 F.2d at 790–791. There we explained that, standing alone, the patient's unsupported statement that he would have foregone the treatment had he known of a risk undisclosed by the physician is too shaky an evidentiary basis to carry the case to the jury on the issue of causation.  *Id.*  Here the statement was made despite overt conduct plainly belying it.

**27.** J. App. 30.

**28.** J. App. 29.

might have done so.[29] We can hypothesize no more telling evidence of what he would have done had he been warned of the possibility of temporary paresthesia before the extractions began.

■■ Moving now to the risk of permanent paresthesia, we agree completely with the District Court that the facts shown by the evidence, viewed with maximum favor to appellant,[30] did not generate a duty to disclose. We held in *Canterbury* that the obligation to inform the patient of appreciable risks [31] depends on the need for the treatment, the likelihood that injury will occur, and the seriousness of any injury that could follow.[32] The only evidence on the incidence of the risk in this case came from appellee, who testified that he had encountered only three to five cases of paresthesia—all of which were temporary—in more than 100,000 extractions.[33] Thus, the evidence before the jury could indicate at most that temporary paresthesia would occur no more than .005% of the time—one chance in 20,000—and that permanent paresthesia could be expected in less than one case in 100,000—or no more than .001% of the time.[34] Moreover, the injury risked here—loss of sensation in a small section of the face—is undoubtedly troublesome but hardly disabling. *Canterbury,* by contrast,

involved a one percent chance of very serious consequential harm.[35] We agree with the District Court that, on the speculative evidence adduced, no prudent juror could reasonably have considered the risk of permanent paresthesia material to a decision on whether to consent to the procedure, and no allegation has been made that appellee had reason to know of any special desire on his patient's part to have a greater-than-average knowledge of potential hazards.[36]

## C

The District Court must thus be affirmed on the issue of nondisclosure. The purpose of the *Canterbury* cause of action is to protect the patient's dignity and free will; it is not an avenue to compensation every time a medical procedure goes awry. There remains, however, the more troubling issue of negligent performance of the first extraction itself.

## III

### A

Several successive procedures customarily attend the removal of an impacted wisdom tooth such as appellant's. The methodology

---

**29.** We are mindful that after the first extraction and before the second, appellant testified, he asked appellee's receptionist about the numbness on the right side of his face and was then told, as appellee himself was later to advise, that it probably would eventually disappear. J. App. 29, 35. We recognize, too, that when the patient affirmatively inquires about the risks of proposed treatment, misrepresentation or concealment on the physician's part presents a situation quite different from that encountered in a negligent performance of the due-care duty to volunteer certain information. *Cf., e. g., Emmett v. Eastern Dispensary & Cas. Hosp.,* 130 U.S.App.D.C. 50, 396 F.2d 931 (1967). Here, however, from aught that appears of record, the responses to appellant's questions were full, frank and not inaccurate. See note 24 *supra; Canterbury v. Spence, supra* note 1, 150 U.S.App.D.C. at 278 n.84, 464 F.2d at 787 n.84.

**30.** See note 92 *infra* and accompanying text.

**31.** See *Canterbury v. Spence, supra* note 1, 150 U.S.App.D.C. at 277–279, 464 F.2d at 786–788.

**32.** *Id.* at 279 & n.86, 464 F.2d at 788 & n.86.

**33.** J. App. 47–48.

**34.** Moreover, as we discuss later, see Part III *infra,* this evidence might well indicate to a jury that these few maloccurrences were products of negligence and not risks inherent in the procedure when properly done. A normal possibility of negligence is one "of which persons of average sophistication are aware," *Canterbury v. Spence, supra* note 1, 150 U.S.App.D.C. at 279, 464 F.2d at 788, and appellant makes no argument that he is below average and that appellee should have realized it.

**35.** 150 U.S.App.D.C. at 269, 464 F.2d at 778.

**36.** See *id.* at 278, 464 F.2d at 787. Nor is it contended that the failure to inquire affirmatively into that need was unreasonable in this situation. See Katz, *Informed Consent—A Fairy Tale? Law's Vision,* 39 U.Pitt.L.Rev. 137, 147, 159–160 (1977).

was carefully described at trial by appellee himself when called as an adverse witness.[37] The initial step is an x-ray of the site of the proposed extraction to provide the basis for a judgment on the level and direction of force possible without inviting injury to the patient.[38] Asked whether omission of the pre-extraction x-ray would affect the dentist's ability to execute properly, appellee declared that "he would be a little bit nuts not to take a picture before, because you have to know how to apply force to take a tooth out. And without seeing the shape of the roots, the curvature of the roots, you cannot tell it by just looking at a mouth. You have to take an x-ray." [39]

The next step, following anesthetization of the area, is a splitting of the tooth, its severance from the jawbone and its removal piece by piece.[40] Only in this fashion could appellant's lower right wisdom tooth be unseated, for it was caught at one point against the tooth in front of it and held below the surface of the gum.[41] After splitting and severing, the distal fragments are taken out, thus leaving a space through which the anterior fragment can be extricated by means of an "elevator." [42] Also involved is a chiseling away of just so much of the jawbone as may be essential to these purposes.[43]

Surgery of this type necessitates the use of pressure, the amount of which must vary from patient to patient.[44] The limit of pressure tolerable in any given case is a judgment call; as appellee explained, "[t]he only way I can judge that is a certain amount of feel, of dexterity, that you have in your hand." [45] But "you have to be careful when you use pressure," he added; [46] "you have to be careful how you put the pressure because you can break off the whole lingual plate of bone . . ."; [47] "I have to be careful how hard I poke, too," appellee continued, "because I don't want to fracture a jaw." [48] Moreover, downward pressure takes the wrong direction, not only because the tooth can be removed without force downward but also because of nerve location.[49] "The alveolar nerve—you try to stay away from it," appellee advised; "I know where it is," he said, "I am not going to go poking down in it." [50] And when asked "if you use an excessive amount of force, you could poke down into that nerve, could you not, sir,' appellee responded, "[i]f you're careless about it. . . . Well, it would be difficult, but if you are careless." [51]

The final step in extraction of an impacted wisdom tooth is removal of tooth and bone chips from, and irrigation of, the socket thus left open.[52] In doing this, a little pressure—not involving the alveolar nerve—is needed to dislodge the membrane.[53] Save for this, however, appellee warned, no force or pressure whatever is to be exerted.[54]

### B

At trial in this case, the evidence was conflicting on whether in all respects this medically established mode of procedure

37. Tr. 40–70.

38. Tr. 41, 61.

39. Tr. 48.

40. Tr. 42–44, 49–50.

41. Tr. 23, 42.

42. Tr. 43–44, 53.

43. Tr. 43, 49–50.

44. Tr. 49, 52–53.

45. Tr. 53. See also Tr. 66.

46. Tr. 46.

47. Tr. 46.

48. Tr. 50.

49. Tr. 64–69. See also text *infra* at notes 72–75.

50. Tr. 50.

51. Tr. 50–51.

52. Tr. 54, 55.

53. Tr. 55–56.

54. Tr. 54.

was adhered to when appellant's lower right wisdom tooth was extracted. To begin with, there was a sharp difference in the testimony regarding whether appellee x-rayed appellant's jaw before the process of extraction commenced. Appellee stated unequivocally that he did, and that he had films to prove it;[55] appellant was equally emphatic that appellee did not x-ray until the extraction was nearly complete and the roots of the tooth could not be located.[56] It does appear that x-ray films were displayed on a viewer during the session,[57] but the issue nevertheless persisted. Appellant took the films to be those made by Dr. Aaronson,[58] and appellee never identified them as the ones he assertedly made; indeed, the record does not clearly reveal whether the films displayed depicted appellant's jaw or someone else's. It is undisputed that Dr. Aaronson sent the films of his x-rays to appellee,[59] but appellee insisted that he was unable to read Dr. Aaronson's films.[60]

In this milieu the jury, had it been permitted to consider the evidence, could have concluded that appellee derived no insight from Dr. Aaronson's films and neglected to make any himself. Accepted medical procedure called for a pre-extraction x-ray;[61] Dr. Aaronson's x-ray films were unhelpful to appellee,[62] and the litigants disagreed about whether appellee had films of his own.[63] Absence of a usable x-ray depicting appellant's dental anatomy would have left appellee surgically blind,[64] and might readily have explained the lengthy and fruitless probe for roots which—if it transpired as appellant described[65]—could have been deemed a departure in some wise from customary practice.[66] A lay jury thus could

have competently addressed and resolved the question whether appellee had measured up to the standard of care incumbent upon members of his profession.

## C

There was, too, evidence by which the jury might have been persuaded that appellee deviated from the professional norm in applying force to remove the tooth and in the manner in which he probed the socket. Appellant's testimony vividly depicted heavy pressure to achieve extraction and extensive post-extraction probing in a fruitless search for roots:

I became very apprehensive because, even with the anesthetic, the amount of pushing down in my lower jaw made it feel like, to me, that my jaw was going to come apart here (indicating) like, you know, he was just going to keep pushing and pushing and twisting on that tooth until he cracked my jaw or something.[67]

\* \* \* \* \* \*

[H]e was pressing sufficiently hard . . . that I just felt like my head and my jaw—like it was going to come apart because he was pressing so hard in getting in there and coming down to it.[68]

\* \* \* \* \* \*

[I]t seemed like after about twenty minutes or fifteen minutes there was a loud crack; and I guess that's when he broke the tooth off and got the tooth.

And then he started poking around again and, oh, five or ten minutes—I don't know—or longer, with a sharp in-

---

55. Tr. 61, 69.

56. Tr. 29; see text *infra* at notes 70–71.

57. Tr. 24–25.

58. Tr. 24–25.

59. Tr. 70.

60. Tr. 70.

61. See text *supra* at notes 37–39.

62. See text supra at notes 58–60.

63. See text *supra* at notes 55–56.

64. See text *supra* at notes 38–39.

65. See text *infra* at notes 69–71.

66. See text *supra* at notes 52–54.

67. Tr. 25–26.

68. Tr. 36.

strument, he just kept poking my gum and so on.[69]

\*     \*     \*     \*     \*     \*

And then finally he said . . . "I can't find the roots," or something to that effect, like he was looking for the roots of the tooth that had been cracked off when he pulled the top off.

And he said, "We are going to have to take another x-ray" or he said, "We're going to have to take an x-ray."

So then they came in and they took an x-ray. . . . [H]e looked at the x-ray . . . and he said, "Oh, damn, the roots aren't there," something like "They're disappeared."[70]

\*     \*     \*     \*     \*     \*

When he looked at the x-ray, he said, "Oh, damn, there's no roots," or something to that effect. You know, "I thought the roots were there."[71]

The importance of this testimony becomes the more apparent when viewed against the backdrop of appellant's dental anatomy. A lower right wisdom tooth is very close to the alveolar nerve,[72] which through two filaments supplies sensation to the chin and lips;[73] it is closer in some individuals than in others.[74] Appellee stated from the witness stand that appellant's lower right wisdom tooth "strattled" the alveolar nerve, "almost touching" it.[75] No wonder it was that, as appellee conceded, any application of pressure demanded caution with respect to both amount and di-

rection to avoid damage to the nerve,[76] which in turn could cause loss of sensation in that region of the face.[77]

Appellant's portrayal of the force and probing involved in removal of his first wisdom tooth attains perhaps its fullest significance in light of the normal outcome of that procedure, which appellee described at trial. Ordinarily, such extractions are unaccompanied by any paresthesia whatever;[78] though a possibility,[79] paresthesia is "a rare complication,"[80] and in appellee's experience has always been temporary.[81] As noted earlier, over many years of practice, appellee had seen no more than five instances of paresthesia out of 100,000 cases, and none at all that was permanent;[82] even more importantly, so appellee testified, there can be no paresthesia unless the alveolar nerve is damaged.[83] And "as a matter of reasonable dental certainty or possibility," appellee avowed, excessive pressure can injure the alveolar nerve "if the force were put in the wrong direction";[84] while it would be "difficult" to "poke down into [the alveolar] nerve" simply by using too much force, it can be done "if you are careless."[85] Because appellant testified to heavy and extensive "pushing down on [his] lower jaw"[86]—the direction to be scrupulously avoided[87] the jury could have concluded that appellant became paresthetic only because the pressure utilized to remove his tooth was negligently excessive or misdirected.

**69.** Tr. 26.

**70.** Tr. 26–27.

**71.** Tr. 28.

**72.** Tr. 43, 44, 46.

**73.** Tr. 46.

**74.** Tr. 45, 63.

**75.** Tr. 44–45, 63–64.

**76.** See text *supra* at notes 47–51.

**77.** Tr. 47.

**78.** See Tr. 47–48, 68.

**79.** Tr. 41.

**80.** Tr. 47.

**81.** Tr. 47, 59.

**82.** Tr. 47–48; see text accompanying notes 33–34 *supra.*

**83.** Tr. 69. See also Tr. 47, 74.

**84.** Tr. 64.

**85.** Tr. 50–51. See also Tr. 67–68.

**86.** See text *supra* at note 67.

**87.** See text *supra* at notes 49–51.

### D

■ The burden was upon appellant to present evidence tending to prove that appellee was negligent [88] and that resultantly appellant was harmed.[89] That responsibility was dischargeable by a prima facie showing that appellee deviated from the procedures or level of caution dictated by accepted dental practice and thereby caused the condition of which appellant now complains.[90] Measured by these principles, appellant's evidence, we conclude, merited jury consideration.

Appellee, an expert, explained adequately enough for lay understanding the norms of relevant dental practice and the interplay of the medical phenomena involved. Two theories of breach of duty were advanced by the evidence and, though with little room to spare, were appreciably supported by it. A causal relationship of any negligence with appellant's paresthesia was the view of Dr. Stevens, another expert, who attributed appellant's paresthesia to injury to the alveolar nerve during the course of the first extraction,[91] and the evidence indicated possible breaches of duty capable of damaging that nerve. Without venturing into the realm of speculation, the jury might have inferred causation from this aggregation of circumstantial evidence.

Combinationally, then, these qualities of appellant's evidentiary presentation rendered it invulnerable to direction of a verdict on either of his two approaches toward negligent-treatment recovery. In dealing with appellee's motion therefor, the District Court was required to yield to appellant the view of the evidence most favorable to him and the benefit of all legitimate inferences flowing therefrom,[92] and by our assessment that consideration was not indulged. That appellant may now receive his just due, we reverse the judgment appealed from and remand the case for a new trial limited to the claim of negligent performance of the first extraction.

*So ordered.*

LEVENTHAL, Circuit Judge, concurring in part and dissenting in part:

I concur fully in Parts I and II of Judge Robinson's opinion for the court. It is a useful and sound development of the doctrine of informed consent that he presented for the court in *Canterbury v. Spence.*[1] Although that doctrine typically operates in the real world to provide a basis for the plaintiff to go to the jury, in this case it dictates the directed verdict for defendant that the trial court entered.

I have difficulties with Part III, which holds that a nonsuit was precluded by plaintiff's evidence that defendant was negligent in the performance of the tooth extraction. I concur in section A, developing the record, and in section B, which finds a dispute in the evidence on the issue whether defendant x-rayed plaintiff's jaw before beginning the extraction. As to this, the case comes up in a stilted way, the verdict having been directed for defendant at the end of plaintiff's case, so that the record does not contain the case that the defendant would have put on. Presumably that would

---

88. *Latta v. Sabin,* 117 U.S.App.D.C. 329, 330, 329 F.2d 897, 898 (1964); *Quick v. Thurston,* 110 U.S.App.D.C. 169, 171, 290 F.2d 360, 362, 88 A.L.R.2d 299 (en banc 1961); *Rodgers v. Lawson,* 83 U.S.App.D.C. 281, 282, 170 F.2d 157, 158 (1948); *Hohenthal v. Smith,* 72 App. D.C. 343, 346, 114 F.2d 494, 497 (1940).

89. *Morse v. Moretti,* 131 U.S.App.D.C. 158, 403 F.2d 564 (1968); *Kosberg v. Washington Hosp. Center,* 129 U.S.App.D.C. 322, 324, 394 F.2d 947, 949 (1968); *Levy v. Vaughan,* 42 App.D.C. 146, 153 (1914).

90. See cases cited note 88 *supra.*

91. See text *supra* at note 3. Compare *Kosberg v. Washington Hosp. Center, supra* note 89, 129 U.S.App.D.C. at 324–325, 394 F.2d at 947–948.

92. *Baltimore & O. R.R. v. Postom,* 85 U.S.App. D.C. 207, 209, 177 F.2d 53, 55 (1949); *Walford v. McNeill,* 69 App.D.C. 247, 248, 100 F.2d 112, 113 (1939); *Jackson v. Capital Transit Co.,* 69 App.D.C. 147, 148, 99 F.2d 380, 381 (1938), *cert. denied,* 306 U.S. 630, 59 S.Ct. 464, 83 L.Ed. 1032 (1939); *Fleming v. Fisk,* 66 App. D.C. 350, 87 F.2d 747 (1937).

1. 150 U.S.App.D.C. 263, 464 F.2d 772, *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

have included the x-rays that the defendant said he took. As to plaintiff's claim that the x-rays were taken by defendant only after difficulties were encountered in the extraction procedure, I presume that the defendant's x-rays would be probative since they would reflect the condition at the time of x-ray. Had the trial judge been more cautious on a point that was relatively demonstrable in proof, he would have avoided an extra burden on the resources of the parties and the courts.

I dissent from Part III C of Judge Robinson's opinion. If the evidence at a new trial should demonstrate that defendant did take a pre-extraction x-ray and that this was not a matter of genuine issue, I would not find the plaintiff's testimony of excessive force sufficient to go to the jury. The source of my difficulty is the combination of two subjective elements—the plaintiff's perception of defendant's behavior (calling for subjective testimony by the plaintiff), and the standard against which that behavior is to be judged (established here by the subjective testimony of the defendant that the appropriate degree of pressure was a matter of "feel"). How can the subjective testimony of the plaintiff as to how *he* felt show a violation of the standard established by the subjective testimony of the doctor as to how *he* felt? Rooted in a general prohibition of jury verdicts based on mere speculation, the law has a concern that doctors who must make sensitive determinations of "feel" (and other sensations) should not be subject to damage suits on the basis solely of a layman's, and especially a plaintiff's, perception of what is excessive.[2]

---

**2.** If I were writing for the majority on this point, I would expand on the basis on which, assuming genuine issue on whether a pre-extraction x-ray was taken, the plaintiff's testimony on the defendant's force and direction might (a) be admissible and (b) be presented to the jury. The matter has some subtleties, and in the current press of business I do not expatiate.